UCANNELLA, Judge.
Defendant, Eudis D. Byles, appeals from his conviction for second degree murder and sentence to life imprisonment without benefit of parole, probation or suspension of sentence. For the reasons which follow, we affirm the conviction and sentence, as amended, and remand.
On October 25, 1992, shortly before noon, Deputy Donald Spell of the Jefferson Parish Sheriffs Office responded to a 911 call in which the caller reported that his neighbor’s door was open. Upon arrival at the residence on MacArthur Avenue in Harvey, Louisiana, Deputy Spell found the front door open with a red Harley-Davidson motorcycle parked in front blocking the door. Deputy Spell entered the residence and found the victim, Lawrence Chapman, lying face down on the floor in the second room from the front door.. The deputy checked the victim and found no signs of life. He thereafter called the Detective ^Bureau Crime Scene Division and assisted in securing the scene. Based on evidence obtained over the next several days, an arrest warrant was issued for defendant and he was ultimately arrested in Austin, Texas on November 18, 1992.
On December 23, 1992, the Jefferson Parish Grand Jury returned an indictment charging defendant and Robert H. Dunn with the first degree murder of Lawrence Chapman, in violation of La.R.S. 14:30. The two men were arraigned on January 22, 1993 and both pled not guilty. On June 16, 1993, at a hearing on numerous pre-trial motions, the trial court granted the state’s motion to sever the cases for trial. The state also orally amended the indictment to charge defendant with the lesser offense of second degree murder, in violation of La.R.S. 14:30.1. This oral amendment was followed by a written amendment to the same effect on June 23, 1993. Defendant’s motion to suppress the oral statements that he made during the investigation was denied.
The case against defendant proceeded to trial before a twelve person jury on July 27 and 28, 1993. The jury unanimously returned a verdict of guilty of second degree murder. After denying defendant’s motion to set aside the jury verdict, on October 12, 1993, the court sentenced defendant, as prescribed by law, to life imprisonment without benefit of parole, probation or suspension of sentence. Defendant appeals.
On appeal, defendant assigns one substantive error and requests a review for errors patent on the face of the record. Defendant argues that the trial court erred in permitting the state’s forensic expert to testify that the victim’s death was caused by more than one person. Such testimony, it is argued, was tantamount to an expression of his opinion of defendant’s guilt.
|4This assigned error grows out of the following testimony given by Dr. Fraser Mackenzie, the forensic pathologist who performed the autopsy on the victim’s body:
MR. LEBLANC:
Q. Did you find any defense wounds on Mr. Chapman’s body?
A. I found no wounds that I would identify as defense wounds, no.
Q. Now based upon your training and experience, what would the lack of de *61 fense wounds on Mr. Chapman’s body lead you to conclude?
A. Without being, having defense wounds on the body, then I conclude that there is some restraining of the body by some mechanism.
Q. Do you have an opinion as to whether or not there was more than one assailant in this case?
MS. KIFF:
Objection, Judge. I don’t see where that’s in his area of expertise and he certainly is not a fact witness.
MR. LEBLANC:
Judge, this is an expert witness. If there is a medical basis for his opinion, he’s entitled to give it. I’m not asking for conjecture or speculation. If he’s got an opinion based upon his training and experience, he’s entitled to give it. If that’s beyond, all he’s got to say is that he’s not comfortable in answering that question, your Honor.
THE COURT:
You’re saying this goes beyond his expertise?
MS. KIFF:
That’s what I’m saying, Judge.
THE COURT:
Why?
MS. KIFF:
Judge, he — what he’s asking him to do is to say how many people there may or may not have been and I don’t think that he can tell from being a medical or a forensic pathologist, how many people would or would not have been present at the time of this incident.
MR. LEBLANC:
Judge, he may not be able to say how many were there, but he could say whether or not 15it was a single assailant. If there is a forensic basis for saying that, that’s exactly why he’s on the witness stand, to testify as an expert witness in forensic pathology.
THE COURT:
Overrule the objection.
MS. KIFF:
Note my objection for the record, please.
BY MR. LEBLANC:
Q. Dr. Mackenzie, did you understand the question?
A. I did.
Q. And would you answer it for me please?
A. Without marks of restraint on the body and without toxicological evidence of being in a subdued state by drugs, I would consider that this individual was restrained in some fashion, by either a physical means or by more than one person.
Q. Now, Dr. Mackenzie, when you arrived at that opinion, was that in any way — did you have any knowledge of the facts of this particular case before arriving at that opinion?
A. I did not.
Q. Ml right, So you’re basing that strictly on medical evidence?
A. Yes.
Defendant argues that he was denied a fair trial by the admission of this testimony because it usurped the jury’s function on a central and material issue at trial, that is, whether defendant participated in the killing of the victim or whether Dunn acted alone. We disagree.
Generally, a witness may testify only to facts within his knowledge and may not testify as to any impression or opinion that he may have. As an exception to that rule however, if scientific, technical, or other specialized knowledge will assist the trier-of-fact to understand the evidence or to determine a fact in issue, a witness, qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise. La.C.E. art,. 702.
|6In a criminal case, every expert witness must state the facts upon which his opinion is based, provided, however, that with respect to evidence which would otherwise be inadmissible, such basis shall only be elicited on cross-examination. La.C.E. art. 705(B).
A physician testifying as an expert may properly give an opinion as to the proba *62 ble manner in which a wound or other traumatic injury was inflicted where such testimony is based on facts within the expert’s knowledge. State v. White, 298 So.2d 733 (La.1974); State v. Hicks, 607 So.2d 937 (La. App. 2nd Cir.1992); State v. Beck, 445 So.2d 470 (La.App. 2nd Cir.1984), writs denied, 446 So.2d 315 (La.1984).
In the instant case, Dr. Mackenzie was tendered by the state and accepted by the defense as an expert in forensic pathology. He had personally examined the victim’s body, performing the autopsy on the body. Dr. Mackenzie testified, in accord with his expertise, that the cause of death was strangulation and that because there were no marks of restraint or toxicological evidence of the victim being in a subdued state by drugs, the traumatic injury was likely inflicted while the victim was restrained by another person. His testimony was based strictly on the medical evidence, within his expertise. It was not related to the facts of the case as he testified that he made his findings without knowledge of the facts of the particular’ case. He did not express an opinion on the guilt or innocence of the accused, the ultimate fact to be decided by the jury. Dr. Mackenzie’s testimony was in compliance with the Code of Evidence and not erroneously admitted. Accordingly we find no merit in defendant’s assignment of error.
Defendant does not directly assign as error the insufficiency of the evidence used to convict him. Indirectly he touches on an insufficiency of ^evidence argument in his argument above concerning the improper admission of Dr. Mackenzie’s testimony. Therefore, we will address that argument herein.
In State v. Burrow, 565 So.2d 972 (La.App. 5th Cir.1990), unit denied, 572 So.2d 60 (La.1991), this court set forth the standard used in determining the sufficiency of .the evidence as follows:
The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Rosiere, 488 So.2d 965 (La.1986); State v. Davis, 540 So.2d 600 (5th Cir.1989). When circumstantial evidence is used to prove the commission of the offense, LSA-R.S. 15:438 mandates that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” The requirement of LSA-R.S. 15:438 does not establish a standard separate from the Jackson standard, but rather provides a helpful methodology for determining the existence of reasonable doubt. State v. Captville, 448 So.2d 676 (La.1984); State v. DiLosa, 529 So.2d 14 (5th Cir.1988), unit denied, 538 So.2d 1010 (La.1989). Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Porretto, 468 So.2d 1142 (La.1985), dissenting opinion, 475 So.2d 314 (La.1985).
In the present case, defendant was convicted of second degree murder. That offense is defined in La.R.S. 14:30.1, in pertinent part, as follows:
A. Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, 18armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
The testimony and evidence admitted at trial established that on October 25, 1992, in response to a 911 call, Deputy Spell discovered a body inside a residence. The victim appeared to be deceased. Detective Ralph Saacks of the Jefferson Parish Sheriffs Office was summoned to the scene. As case officer, he directed the crime scene techni- *63 dan in the gathering of evidence.[1] He. also completed a vehicle theft report for the victim’s pick-up truck and entered the license number into the National Crime Information Center (N.C.I.C.) as being a stolen automobile.
In the meantime, on the preceding day, Officer David McAninch of the Houston Police Department arrested original co-defendant, Robert Dunn. According to Officer McAninch’s testimony at trial, he received a call regarding a man asleep in a vehicle parked on the side of a freeway. When the officer arrived, he observed Dunn drunk and asleep in the truck and thereafter arrested him for public intoxication.[2] At this point, Officer McAninch did not know the vehicle was stolen. Nonetheless, he had the truck impounded for safety reasons. The officer also determined that the vehicle was registered to Lawrence Chapman lain Harvey, Louisiana.
Detective Saacks was thereafter informed that the truck which he had entered as stolen in the N.C.I.C. computer had been located in Houston. Detective Saacks immediately traveled to Houston to further investigate. Upon his arrival, Detective Saacks met with Sergeant James Ramsey of the Houston Police Department who was assigned to assist him in the investigation of the case. Officer Ramsey testified that after he was briefed on the facts of the case, he made arrangements to have the 1976 Ford truck towed from the wrecking yard to be processed. Officer Ramsey oversaw the collection of evidence from the truck and the transference of that evidence to the Jefferson Parish authorities.[3] On the following day, Dunn was arrested at an apartment in Houston. Following his interview with Dunn, Detective Saacks returned to New Orleans with the suspect. Based on information he learned from this interview, Detective Saacks compiled a photographic line-up which contained a picture of defendant. Detective Saacks subsequently showed this photographic line-up to Emma Rouboin, a barmaid employed at Ann’s Lounge in October of 1992. She positively identified defendant as the individual who came into the bar with a friend on the Friday before Halloween and asked her if she needed some quarters. Defendant and his friend cashed about $40 worth of quarters. She also identified Dunn, in a one-on-one confrontation, as the gentleman with defendant.
Following Ms. Rouboin’s positive identification, Detective Saacks obtained an arrest warrant for defendant and entered the warrant into the N.C.I.C. Iipcomputer. Defendant was arrested on November IS, 1992 in Austin, Texas. When he got notification that defendant had been arrested, Detective Saacks went to Austin and spoke to him at the Travis County Jail. After advising defendant of his rights and filling out a rights form, defendant indicated that he understood his rights and wished to waive them. In defendant’s first statement, he admitted that he had known Chapman for about five years and that Chapman had tried to help him in the past. In his statement, he claimed that he met Robert Dunn in October in a bar in the French Quarter. Sometime after that, defendant took Dunn to Chapman’s house to see if Chapman could help him. Defendant stated that Chapman gave him $20 and a ride to Highway 90, after telling Dunn to wait outside the house for Chapman’s return. Defendant claimed that he subsequently hitchhiked to Texas and this encounter was the last time he saw either Dunn or Chapman.
*64 After the first statement, Detective Saacks and defendant flew back to New Orleans. There, the detective took a second statement because defendant told him on the plane that he wanted to tell the truth. In this second statement, defendant again stated that he met Dunn in October and during the course of one of their meetings, defendant told Dunn, a Korean Veteran, that he had a friend, Chapman, who helped veterans and that he might be able to help him get a job. Defendant then told Dunn that Chapman kept a lot of money on hand and suggested that they rob Chapman and go to South America. During the course of the robbery, Dunn told defendant to go to the store and that he would take care of the matter. When defendant returned, he saw Chapman laying-on the bed with blood everywhere. They took some of the victim’s coins, his television and truck and left for Houston. When they got to Houston, defendant asked Dunn to bring lnhim to Galveston for a couple of days. Defendant claimed that it was his intent to rob Chapman, but not to kill him.
After this second statement, Detective Saacks took a break. Then, he decided to take a third statement from defendant, because he felt that defendant was not telling him the truth. Detective Saacks confronted defendant that he did not think that Dunn alone could overpowered the victim by himself, considering the victim’s size. In his third and final statement, defendant stated that he and Dunn were going to Chapman’s house so Chapman could help Dunn. On the way over there, defendant suggested that they rob Chapman. When they arrived, Chapman was not home. The two men went into his house, got some money and then went to Ann’s Bar to have some drinks. When they went back to Chapman’s house, Chapman answered the door and told them that somebody had broken into his house. Defendant then introduced Dunn to Chapman. Chapman recognized his hat on Dunn’s head and realized what had happened. Defendant grabbed Chapman, threw him on the bed and told Dunn to get something with which to tie him. Defendant grabbed Chapman’s arms, held them behind him and tied a whip around his neck and legs. Defendant then wanted to search the house, fill their truck with valuables and leave for South America. Defendant looked in the refrigerator and saw that there was nothing to drink. Intending to be there all night, defendant went to the store to get some beer. When he came back from the store, he saw Chapman lying down, with blood everywhere. He also saw Dunn getting up with two knives in his hands. The two men immediately took some items and left the house.
At trial, the state also called Troy Fonseca as a witness. Fonseca testified that in November of 1992, he was arrested for disturbing the peace and | ^incarcerated at the Jefferson Parish Correctional Center. While there, defendant, who was also incarcerated, made a statement to Fonseca that “I slit the m f ⅛ throat.” When Fonseca was released, he did not immediately go to the police. However, after two nights at home with nightmares, Fonseca decided to call the police. He positively identified defendant in a photographic line-up and in court as the person that made the statements to him while they were incarcerated together.
After being stipulated as an expert in forensic pathology, Dr. Fraser MacKenzie, with the Jefferson Parish Coroner’s Office, testified that he performed an autopsy on the victim on October 26, 1992. He observed several stab wounds which he concluded to be superficial and non-life threatening. According to Dr. MacKenzie, the cause of death was strangulation and asphyxia by strangulation. He did not find any restraining marks or defense wounds on the victim. Without restraint marks and without toxicological evidence of being drugged, Dr. MacKenzie expressed his opinion that the victim was restrained in some fashion by either a physical means or by more than one person. After trial, the jury unanimously found defendant guilty of second degree murder.
Upon our review of the testimony and evidence admitted at trial, it is clear that there was sufficient evidence presented for a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. Defendant ad *65 mitted that it was his idea to rob the victim, that he accompanied Dunn to the victim’s home with the intent to rob him and that he assisted in placing a bull whip around the victim’s neck. The pathologist testified that the victim died from strangulation, and was already dead when his throat was cut. Thus, even if the jury believed hgdefendant that Dunn was the person who slit the victim’s throat and that he was not present when it happened, the evidence is still sufficient to support the conviction for second degree murder. There was sufficient evidence for the jury to find that defendant killed the victim with specific intent to kill or to inflict great bodily harm, and/or that he was a participant and principle in a robbery that resulted in the victim’s death.
Defendant requests that this court conduct a review for any errors patent on the face of the record. In doing so, in compliance with La.C.Cr.P. art. 920, we note that the trial court failed to give the defendant credit for time spent in actual custody prior to the imposition of sentence as mandated by La.C.Cr.P. art. 880. Therefore, we order that the sentence, the minute entry and the commitment reflecting the sentence be amended to give defendant credit for time served in actual custody prior to the imposition of sentence.
Our review further reveals that, at the time of sentencing, the trial judge did not inform defendant of the prescriptive period for post-conviction relief which is mandated by La.C.Cr.P. art. 930.8 C. However, failure to so inform defendant does not constitute grounds for reversing the sentence. La. C.Cr.P. art. 921; State v. Kershaw, 94-141 (La.App. 5th Cir. 9/14/94) 643 So.2d 1289. The trial judge is ordered to inform defendant of the provisions of La.C.Cr.P. art. 930.8 by sending appropriate written notice to him within 10 days of the rendition of this opinion and to file written proof that defendant received the notice in the record of this proceeding.
Accordingly, for the reasons stated above, defendant’s conviction for second degree murder is affirmed and his sentence, to life imprisonment without benefit of parole, probation, or suspension of sentence, as amended to give credit l^for time served, is affirmed. The case is remanded to the trial court with instructions to notify defendant of the provisions in La.C.Cr.P. art. 930.8.

CONVICTION AFFIRMED; SENTENCE AFFIRMED, AS AMENDED; CASE REMANDED.

. Crime scene technician Edwin Brown of the Jefferson Parish Sheriff’s Office testified that on October 25, 1992, he went to the crime scene on MacArthur Avenue to collect evidence and take photographs. He testified that he collected ten pieces of evidence from the scene including a steak knife that appeared to have a blood-like substance on it. He also recovered various items of evidence from the morgue, including a leather bullwhip that he removed from the victim's body.

. On October 28, 1992, Officer McAninch met with detectives from the Jefferson Parish Sheriff's Office in order to view a photographic lineup. He positively identified defendant Dunn as the person he arrested inside Chapman's vehicle.

.One of the items seized was a brown paper bag in the bed of the vehicle that contained numerous credit cards in the name of Lawrence Chapman as well as loose and rolled pennies. On cross-examination, Office Ramsey testified that from his direct knowledge, all of the items seized are associated with Dunn.