MARY ALICE TERRY *v.* STATE OF MARYLAND

[No. 233, September Term, 1976.]

*Decided December 6, 1976.*

The cause was argued before GILBERT, C. J., and MELVIN and LISS, JJ.

*Victoria A. Salner, Assistant Public Defender*, with whom was *Alan H. Murrell, Public Defender*, on the brief, for appellant.

*Alexander L. Cummings, Assistant Attorney General*, with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City*, and *Mary Ann Willin, Assistant State's Attorney for Baltimore City*, on the brief, for appellee.

LISS, J., delivered the opinion of the Court.

> "Man's inhumanity to man
> Makes countless thousands mourn! " [1]

How much more mournful is the increasing incidence of brutality and abuse of children by adults?

The appellant, Mary Alice Terry, was convicted of second degree murder and child abuse in a jury trial in the Criminal Court of Baltimore (Levin, J., presiding).

In May of 1975, the Baltimore City Police were alerted to the fact that Michael Hall, the five year old son of the appellant, had been missing since sometime in September of 1974. The police in the course of their investigation interviewed the appellant, and she finally admitted that the child had died in September of 1974 and that she and a

---

1. Robert Burns, *Man Was Made to Mourn*, Stanza 7 (1786).

friend had disposed of the child's body by throwing it into a storm sewer. The body was never recovered.

The appellant stated that the child had been sick for several days prior to his death because of beatings administered by her husband, John Terry, the child's stepfather. She contended that she had not taken the child to the hospital or reported the incident to the police because her husband had threatened to kill her and two of her children who also lived with them if she reported the beatings.

The testimony at the trial revealed that Michael had resided with his grandmother in North Carolina until he was four years old. In November of 1973, he came to Baltimore to live with his mother and her husband. Almost immediately after his arrival at his mother's home a systematic brutalization began. An aunt testified that shortly after Michael arrived she visited the Terry house for two months and saw Michael being beaten frequently with a leather strap. Michael's ten year old brother and eight year old sister testified to mistreatment extending over a period of almost a year. The brother, Charles, saw the appellant beat Michael a "few times" with "a big white stick" and a "lot of times with a red strap." He also testified that he saw his mother, the appellant, hang Michael "on the door by his feet a few times for a little while." On one occasion he saw blood on Michael's arms and face after the appellant "beat Michael by making him stand on his head." She would not feed Michael "a lot" and would put him naked in the basement "a lot." Michael was skinny and walked with a limp from a beating given him by his mother. The last time he saw his brother he was upstairs on a mattress throwing up for a long period of time. When he woke up the next morning Michael was gone and Charles never saw him again.

The sister, Yvette, substantiated the testimony of Charles and added that Michael had little scars on his back, arms and legs caused by the beatings administered by her mother and stepfather.

A next-door neighbor testified that Michael had "plenty" of scars on him and that she had seen the appellant "slam" him

down and kick him in the buttocks. In addition, she said she had seen him being thrown out of the back door of the Terry house and had also seen him naked in the Terry's basement. She heard beatings administered to him four or five times a week.

Another State's witness, James Watson, testified that he had seen Michael beaten with a dog's leash for two to three minutes on three to five occasions. He recalled the day Michael died was a Sunday, and that earlier in the week Michael was sick and "could hardly move" after the appellant had beaten him. He asked the appellant to take Michael to a doctor, but she did not do so. The day Michael died Watson and John Terry had been out together all day. When they returned, the appellant was waiting for them in the doorway and asked Watson to wait outside. John came out and said "we might as well tell him, he'll find out anyway." Appellant then told him Michael was dead. Watson saw Michael on the bed with raw wounds on his back and buttocks. Appellant told them she had beaten Michael, and when she turned him loose he began throwing up all over the floor. Appellant persuaded Watson to assist her in disposing of the body which was placed in a laundry bag and the bag and body dropped down a manhole into the sewer.

The final State's witness was Dr. Hormez Guard, Assistant Medical Examiner for the State of Maryland. Dr. Guard recited his qualifications as an expert in the field of forensic pathology and stated that he was qualified to give opinions in that field. No issue was raised by defense counsel as to his expertise. Dr. Guard had been present in court during all of the testimony of the State's witnesses with the exception of one, and the testimony of that witness was read to him. The doctor was then asked the following question:

> "Now, again, Dr. Guard, based on the testimony that you have heard, seen, and which has been read back to you, with reference to the death of Michael Hall, can you with any reasonable degree of medical probability or reasonable probability tell the members of the jury the cause of death of Michael Hall?

MR. HARLAN: Your Honor, for the record I object. I do not wish to be heard.

THE COURT: Overruled. You may answer.

MR. HARLAN: Thank you, Your Honor.

A. From the testimony presented to this Court and to which I have been a witness for the last two days it is my opinion that the death of Michael Hall, a five year old child, resulted from cumulative effects of repeated child abuse."

The State thereafter continued its questioning of Dr. Guard and elicited the following testimony:

"Q. Thank you, Dr. Guard. Dr. Guard, taking the facts of this particular case with which you are familiar would you enumerate for the members of the jury the compilation of causes of the death of Michael Hall?

A. As I said before I listened very carefully to the testimony presented by the two young siblings of young Michael Hall. Also the testimony of the others that were presented here. I have heard that he was beaten repeatedly with a wooden stick and with a heavy dog leash. I am aware of the types of dogs that were in the family, two large shepard dogs. That means that the leash was a strong metallic leash part of which was entered into evidence also. I have not seen the wooden stick but the way it is described it looked like it is a strong enough piece of wood which would inflict severe injuries. Then there is the record of causes of injuries which produced multiple scars. It must be realized that a scar is produced in skin when it is broken. If it is only a bruise which may redden or yellow on healing but disappears, does not leave a scar. When a scar is formed in the skin it means that the skin was broken and healing took place finally causing a dense fibrous scar. That means that at some time this injury had bled and had been an open wound. There is testimony to this where witnesses have said they have seen bleeding

injuries on the skin of this child. There is evidence of chronic malnutrition. The child was repeatedly denied normal nourishing food at regular intervals. The siblings have said, that was also said by Mr. Watson, that he was denied food, that he had to feed him, this should be the normal procedure to come from the parents. And there was isolation in the basement which was, I do not know why it was used maybe it was used for punishment to bring in discipline. I do know what time of the year, what clothing on, he was put into the basement, it may have been in the winter time without proper clothing. He may have been exposed to extreme degrees of cold. Basements are not normally heated. And then the last which disturbed me most was hanging the child by his feet as demonstrated by his own brother in a drawing as to how it was done. The human body is not designed to live in an inverted condition. The anatomical systems of the human body, as the circulatory design in which the heart can pump the blood. In order to do that function very well the veins which bring the blood into the heart have valves. The veins of the legs have valves. But the veins of the neck and the upper portion do not have valves with the result if you invert a person and hold him in that position it would cause severe congestion of his face, his lungs, and it would congest his brain which may rupture some of his blood vessels and which would ultimately lead to death. We do not know how long this boy was hung upside down but with his condition of malnutrition, poor status, I am sure that this inversion of the body must have produced severe effects.

Q. Dr. Guard, in your opinion as an expert what was the manner of death?

MR. HARLAN: Objection for the record, Your Honor.

THE COURT: Overruled.

MR. HARLAN: Thank you, Your Honor?

A. In view of the evidence presented I come to the conclusion that the manner of death is to be considered as homicide."

The appellant contends the questions propounded to Dr. Guard, in which he was requested to give an opinion as to the cause and manner of death of Michael Hall, were objectionable and the doctor should not have been permitted to testify. We have carefully considered the reasons given by the appellant and we do not agree. We shall affirm.

The appellant, for clarity, has separated her reasons for objecting to Dr. Guard's testimony into four parts. Initially, she complains the trial court failed to apprise the jury that the witness was merely assuming the facts to be true. The appellant submits in support of her contention *Treffinger v. Sterling*, 269 Md. 356, 359, 305 A. 2d 829, 831 (1973), in which our Court of Appeals said that there are two methods to frame properly a hypothetical question. "[O]ne is to state for the witness such facts as are essential to the foundation of an opinion, ask him to assume the truth of the facts so stated, and then render an opinion upon them; the other is to ask the expert to predicate his opinion upon uncontradicted evidence heard or read and assumed to be true."

Our reading of the cases does not convince us that a failure to include the prefatory phrases "assume the truth of the facts so stated" or "assumed to be true" would make otherwise admissible opinion evidence inadmissible and reversible error. To suggest that the jury might be misled into believing the witness was premising his opinion on a *belief* of the truth of the testimony rather than on an *assumption* of its truth seems to us to be specious. We note the trial court in its charge to the jury correctly stated the law as to the jury's responsibility in considering the evidence. The trial court said:

"The testimony of a witness should be considered and weighed by you like any other evidence in this case, and given the weight to which you deem the opinion to be entitled. You may reject the opinion if

the facts upon which it is based have not been established to your satisfaction by the evidence, or, if you are not satisfied with the reasons given in support of the opinion. However, the reverse may equally be true; i.e., if you do find credible the reasons advanced by the witness, then you may in your own judgment and determination give such credence to the expert's opinion as you may wish."

No objection was made to the charge as given, nor did the appellant request any additional clarifying instructions. In any event the issue has not been preserved for appellate review. Md. Rule 756 g.

Secondarily, the appellant urges that the witness failed to apprise the jury with particularity of the basis for his conclusions, and that the expert witness had an insufficient basis for expressing his opinion. Our reading of the record makes it clear that the basis for the witness' conclusion was the testimony he had heard and had had read to him. The compilation of the causes of death to which he testified was fourfold and he categorized them as: (1) bleeding injuries to the body producing multiple scars; (2) chronic malnutrition; (3) exposure; and (4) inversion of the body. There was evidence in the case supporting each of these categories. The expert witness was subjected to rigorous cross-examination by competent trial counsel which the jury could consider in reaching its conclusion as to the weight to be given to the expert's testimony. *See Williams v. Graff,* 194 Md. 516, 71 A. 2d 450 (1950); *Plank v. Summers,* 205 Md. 598, 109 A. 2d 914 (1954). We have quoted in full the statement by the expert as to the factual basis for his conclusion and we find it more than sufficient to support his conclusion.

We shall consider together the third and fourth complaints concerning the expert's testimony. The appellant contends the witness' opinion was of no appreciable help to the jury and that the opinion was based upon conflicting evidence.

The admission of expert testimony is within the sound discretion of the trial court. *Nolan v. Dillon,* 261 Md. 516, 276 A. 2d 36 (1971). The approved test as to the admissibility of

expert opinion is whether the jury can receive appreciable help from the particular witness on the subject, not whether the jury can decide the particular issue without expert help. *Nizer v. Phelps*, 252 Md. 185, 249 A. 2d 112 (1967); *Baltimore Co. v. State, Use of Keenan*, 232 Md. 350, 193 A. 2d 30 (1962); *Harper v. Higgs*, 225 Md. 24, 169 A. 2d 661 (1961); 7 Wigmore, *Evidence* § 1923 (3rd ed. 1940); McCormick, *Evidence* § 13 (1972). The medical examiner's testimony as to the factual basis on which he reached his conclusions was detailed and specific. The technical explanation of the effect that hanging the child by his feet would have on the child's circulatory system was not information ordinarily known to the average layman. The explanation of the cumulative effect on the health and well-being of a child subjected to the abuse detailed in the testimony required the expertise of one familiar with the physiology of the human body. Our reading of the record convinces us that the trial court did not abuse its discretion and that the expert opinion and the factual basis upon which it was reached could have been and was of appreciable help to the jury. Nor is the appellant's contention that the opinion was based on conflicting evidence of any merit. While it has been stated that an expert's opinion based upon assumed facts cannot be based upon conflicting evidence as to the facts, the rule does not say that an expert may not express an opinion where some fact or facts may point to one conclusion and another or others point to an opposite conclusion. *Twombley v. Fuller Brush Co.*, 221 Md. 476, 158 A. 2d 110 (1960); *Nolan v. Dillon*, *supra*. There is no basis for concluding that the trial court abused its discretion in admitting the expert's opinion.

At argument, counsel for the appellant called our attention to *Benjamin v. Woodring*, 268 Md. 593, 303 A. 2d 779 (1973). We have carefully reviewed that case and find it to be inapposite. There the issue was whether the medical examiner's statement of opinion in a death certificate that death resulted from a suicide was admissible. The examiner was not called as a witness. In spite of the suggestion by the Court that the investigative duties of medical examiners are limited by law to "essential facts concerning the medical

108

causes of death," we cannot conceive that this precludes calling the medical examiner as an expert witness to express his opinion in a case. Once called, testifying under oath, subject to the requirement that he state the basis for his conclusion and be subject to cross-examination, an entirely different situation exists than an effort to introduce that opinion into evidence solely on the basis of a death certificate.

*Judgments affirmed.*
*Costs to be paid by appellant.*