714 A.2d 864

Dwayne SIPPIO

v.

STATE of Maryland.

No. 70, Sept. Term, 1997.

Court of Appeals of Maryland.

Aug. 5, 1998.

634

**636**

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender; Margaret L. Lanier, Asst. Public Defender, on brief), Baltimore, for Petitioner.

Annabelle L. Lisic, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

CHASANOW, Judge.

In this appeal, we are called upon to address the following issues:

1. Did the trial court err in permitting a medical examiner to give opinion testimony as to a decedent's manner of death?

2. Does our ruling in *Sahin v. State,* 337 Md. 304, 653 A.2d 452 (1995), allowing a defendant on trial for a veracity impeaching offense to present evidence of his character for truthfulness after he testifies, apply where the de-

fendant has announced his intention to testify but has not yet done so?

For the reasons set forth below, we shall hold that under the rules of evidence on expert testimony, the trial court did not err in admitting a medical examiner's testimony as to manner of death. We shall further hold that the requirement of *Sahin, supra,* that a criminal defendant charged with a veracity impeaching offense may present evidence of his or her character for truthfulness only *after* the defendant elects to testify, is not met by a nonbinding announcement of the defendant's intention to testify. We shall therefore affirm the judgment of the Court of Special Appeals affirming Sippio's conviction.

I.

It is undisputed that, on December 30, 1995, Brenda Branch died as the result of a gunshot fired by Petitioner Dwayne Sippio, Branch's acquaintance of seven years and the father of her six-year-old daughter Demetrius. The shooting occurred in Branch's home in Baltimore City. Although Sippio maintained a separate residence in Baltimore City, Sippio stayed at Branch's home on frequent occasions, including the two weeks prior to the shooting. Demetrius and Gavin, Branch's son from a previous relationship, also resided at Branch's home.

Following Branch's death, Sippio was arrested and charged with murder, use of a handgun in the commission of a felony, and unlawfully wearing, carrying, and transporting a handgun. A jury trial commenced on July 9, 1996 in the Circuit Court for Baltimore City. Because Sippio admitted to having fired the shot that caused Branch's death, the trial centered on whether that shooting was accidental or deliberate.

At trial, Demetrius, who was an eyewitness to Branch's death, testified that, on the day of the shooting, she overheard a conversation between Branch and Sippio in which Sippio requested that Branch give him a set of keys she had in her possession and Branch repeatedly asked Sippio for money. Demetrius further testified that after this discussion, she saw

Sippio pull a gun from his coat pocket and heard him say to Branch that it was "time for her to go," to which Branch responded: "[P]lease don't shoot me." Demetrius then saw Sippio shoot Branch. After the shooting, according to Demetrius, Sippio removed a set of keys from Branch's body and brought Demetrius to her grandmother's house.

Gavin testified that he left Branch's residence several hours before the shooting occurred and, thus, did not witness the shooting. Gavin, however, testified that, at times including the few weeks before the shooting, he had heard Sippio call Branch derisive names and, on the night before the shooting, Sippio had responded angrily to Branch's playful request for money. Gavin further testified that Branch "put [Sippio] out all the time . . . [l]ike when he wouldn't give her money to pay the bills and stuff and she would tell him to pack his stuff and leave." Gavin also testified that, prior to the shooting, he found Sippio's unloaded gun in a bedroom drawer and that Sippio kept the bullets separate from the gun.

Another witness for the State, Detective Donald Steinhice, testified that he took a taped statement from Sippio at the Baltimore City Police Department's Homicide Unit on the day of the shooting. That taped statement was played at trial during the detective's testimony. According to Sippio's taped statement, Sippio thought that he had removed all the bullets from the gun before pointing it at Branch and pulling the trigger. Detective Steinhice also testified that, based on his observations of the crime scene, he believed a struggle had occurred.

The last witness for the State's case-in-chief, John Smialek, Chief Medical Examiner for the State of Maryland, testified as an expert in forensic pathology. Dr. Smialek had conducted the autopsy of Branch and had signed the autopsy report which was admitted into evidence as part of the medical examiner's report without objection during the direct examination of Dr. Smialek. As required by law, Dr. Smialek recorded Branch's cause and manner of death in the medical examiner's report. *See* Maryland Code (1982, 1994 Repl.Vol.),

Health–General Article, § 5–311(a)(2)(iii).[1] Based on his examination of Branch, Dr. Smialek concluded that the cause of death was a close range gunshot wound to the head. After further investigation, which included a discussion with Detective Steinhice, Dr. Smialek concluded, and recorded in the medical examiner's report, that Branch's manner of death was homicide, thus ruling out the other possibilities—accident, suicide, natural, and undetermined—that appear in the medical examiner's report. Throughout direct examination and cross-examination of Dr. Smialek, no mention was made of the concepts of "homicide" or "accident." On redirect examination, however, Dr. Smialek was asked about his report and testified that he had marked an "X" next to the term "homicide." On recross, he explained that he had marked "homicide" rather than "accident" because the block marked accident is "reserved for a death that is the result of an action that was unexpected, untoward, that type of an event[, *e.g.*,] * * * someone who tripped on the stairs, fell down and struck their head and sustained a fatal . . . injury." He also noted that his opinion that this was a homicide meant "that *someone else* fired a weapon to kill Ms. Branch," regardless of the shooter's intent.

The defense called several witnesses to testify to Sippio's character. One of those witnesses, Michael Martin, who had known Sippio for about fifteen years, described Sippio as a quiet person who stayed to himself. When, however, Martin was asked "Has [Sippio] been a truthful person to you?," the State objected, and the court sustained the objection.

As defense counsel had indicated during opening statements, Sippio testified at trial. He was the last witness called by the defense. According to Sippio, on the day of the shooting, Branch repeatedly requested money from him and requested that Sippio pack his belongings and leave her home. One of the items Sippio retrieved was a handgun, which he placed in his pocket. Sippio testified that the gun was normal-

---

1. Unless otherwise indicated, hereinafter all references are to Maryland Code (1982, 1994 Repl.Vol.), Health–General Article.

ly kept unloaded in Branch's home, but he had loaded the gun that morning while he was gathering his possessions. According to Sippio, at some point after that but before Branch was shot, he unloaded the bullets into his hand and placed them in his coat pocket. He offered no explanation as to how the gun became reloaded before Branch was shot. According to Sippio, he called Branch into the kitchen where they again discussed money. At some point during this discussion, Sippio retrieved the gun from his coat pocket and began "playing with it." On direct examination, Sippio explained his version of what happened next:

"[Defense counsel]: How did you begin playing with it? What did you do?

[Sippio]: No more than just fire it.

[Defense counsel]: And when you say no more than firing it, what does that mean to you?

[Sippio]: That my hand was on the trigger.

[Defense counsel]: Did you pull the trigger?

[Sippio]: Yes, sir.

[Defense counsel]: How many times did you pull the trigger?

[Sippio]: It was numerous times. I don't remember how many times. Maybe once, twice or three times, I don't remember.

\* \* \*

[Defense counsel]: Where was the gun pointed?

[Sippio]: On an angle towards her, by the eye, somewhere along in there.

[Defense counsel]: Why were you pointing the gun there?

[Sippio]: I was just playing with the gun.

\* \* \*

[Defense counsel]: And what happened when you were playing with it?

[Sippio]: After I finished playing with it the first time, the second time nothing happened.

[Defense counsel]: ... [W]hat did Ms. Branch do?

[Sippio]: Ms. Branch was standing right in front of me.

[Defense counsel]: Had you ever done this before?

[Sippio]: Only in the privacy of the bedroom area. Behind closed doors.

[Defense counsel]: But you did it this morning, is that correct?

[Sippio]: Yes, sir, I did.

\* \* \*

[Defense counsel]: What happened?

[Sippio]: First, like I said, the first two times, nothing came out of the gun at all. \* \* \* Then a shot came out.

[Defense counsel]: And then what happened?

[Sippio]: Ms. Branch dropped right in front of me."

Then, according to Sippio, he grabbed Demetrius and exited the house.

The jury acquitted Sippio of first-degree murder, but convicted him of second-degree murder, felonious use of a handgun, and unlawfully wearing, carrying, and transporting a handgun. Sippio was sentenced to thirty years imprisonment for the second-degree murder conviction and to a concurrent five-year term for the felony handgun conviction. The court merged the other handgun conviction.

On June 11, 1997, in an unreported *per curiam* opinion, the Court of Special Appeals affirmed Sippio's convictions, holding that the testimony of the medical examiner was properly admitted. The intermediate appellate court also concluded that the requirement set forth in *Sahin, supra,* precluded Sippio from introducing character testimony as to his veracity before he testified. The court rejected a third claim raised by Sippio, not presently before this Court, that irrelevant and prejudicial evidence was admitted by the trial court. Sippio

petitioned this Court, and we granted certiorari on September 15, 1997.

## II.

The first issue on appeal is whether the trial court properly allowed Dr. Smialek's opinion testimony that Branch's manner of death was "homicide." Manner of death, as opposed to cause of death, refers to how the death occurred, the circumstances surrounding the decedent's death, *e.g.*, whether the death was the result of a suicide, homicide, accident, or natural causes. *Cf. Schlossman v. State*, 105 Md.App. 277, 297 n. 5, 659 A.2d 371, 381 n. 5 (1995), *cert. dismissed*, 342 Md. 403, 676 A.2d 513 (1996). Cause of death, on the other hand, is the actual process which produces the death. *Cf. id.* During the State's case-in-chief, Dr. Smialek testified that Branch's cause of death was a gunshot wound to the head, and the medical examiner's report that Dr. Smialek prepared was admitted into evidence without objection. On redirect examination, Dr. Smialek testified that he placed an "X" on the medical examiner's report to denote that Branch's manner of death was homicide. Sippio objected, and the court overruled the objection.

The contested issue at trial surrounding Branch's death was whether the shooting by Sippio was accidental or deliberate. According to Sippio, by testifying that the manner of death was homicide, Dr. Smialek was explicitly rejecting the possibility that the shooting was an accident. Sippio contends that, although "the term 'homicide,' taken alone, does not constitute a crime[, w]hen juxtaposed with such concepts as accident, suicide, and natural causes, ... it clearly takes on a criminal connotation." Sippio also claims this testimony reached a legal conclusion reserved for the jury and, therefore, was not a proper subject of expert opinion testimony according to settled Maryland case law. We disagree.

### A.

Prior to the instant case, this Court had not addressed the admissibility of a medical examiner's *testimony* concerning

manner of death. We did, however, address a similar issue in *Benjamin v. Woodring*, 268 Md. 593, 303 A.2d 779 (1973), which involved the admissibility of a death certificate containing a medical examiner's *written opinion* as to manner of death. In *Benjamin*, the testator's wife commenced a civil suit against the personal representative of the testator's estate, seeking to have the testator's earlier will admitted to probate, thus nullifying a later will. 268 Md. at 595, 303 A.2d at 781. She claimed that, at the time the testator executed the subsequent will, he was suffering from an insane delusion regarding her marital fidelity and thus lacked testamentary capacity. *Benjamin*, 268 Md. at 600, 303 A.2d at 784. An autopsy was performed on the testator by an assistant state medical examiner, Dr. Charles Springate. The jury was advised that the death certificate prepared by Dr. Springate stated that the " 'immediate cause of death was an overdose of barbiturates.' " *Benjamin*, 268 Md. at 596, 303 A.2d at 782. Upon the personal representative's objection, however, the trial court refused to admit into evidence the death certificate itself which contained the medical examiner's opinion that the manner of the testator's death was suicide. *Id.* A finding of suicide would have supported the wife's assertion that the testator suffered from insane delusions at the time the later will was drawn. *Benjamin*, 268 Md. at 605, 303 A.2d at 786.

The trial court in *Benjamin* excluded the manner of death portion of the death certificate from evidence based on Md. Code (1957, 1971 Repl.Vol.), Article 43, § 26,[2] which provided in pertinent part: " 'Certificates of birth, death and fetal death filed within one year after the event, and certified copies of such certificates shall be prima facie evidence of the *facts therein stated.* . . .'(Emphasis added.)" 268 Md. at 606, 303 A.2d at 787. The trial court interpreted that section of the statute to mean that, despite a statutory mandate that certain information be incorporated into the certificate, not all infor-

---

**2.** Article 22 and the portions of Article 43 concerning Postmortem Examiners were repealed in 1982 and incorporated into the newly-formed Health–General Article, § 5–301 *et seq.* Chapter 21 of the Acts of 1982.

mation contained in a death certificate qualified as facts. *Benjamin,* 268 Md. at 606–07, 303 A.2d at 787. The trial court referred to such nonfactual information as " 'indications, inferences, or conclusions drawn by the certificate maker.' " [3] *Benjamin,* 268 Md. at 606, 303 A.2d at 787. This Court affirmed the trial court's exclusion of the death certificate from evidence, reasoning that the legislature evidently intended to limit the medical examiner's investigative duties to " 'essential facts concerning the *medical* causes of death.' " *Benjamin,* 268 Md. at 608, 303 A.2d at 788 (quoting Md.Code (1957, 1973 Repl.Vol.), Art. 22, § 6)(emphasis added in *Benjamin* ).[4] Sippio now urges this Court to extend *Benjamin* one step further to prohibit *per se* a medical examiner's testimony at trial regarding manner of death. As we shall explain, however, we do not believe such an extension is warranted. We turn now to the statutory basis for the medical examiner's opinion and developments in that law which make *Benjamin* inapposite.

## B.

Section 5–301 *et seq.* of the Health–General Article establishes the State Postmortem Examiners Commission and sets

---

**3.** Interestingly, when *Benjamin v. Woodring,* 268 Md. 593, 303 A.2d 779 (1973), was decided, line 22a of the Maryland death certificate form specifically called for the medical examiner's "opinion" as to manner of death. In *Benjamin,* this Court found that the intentional use of the word "opinion" supported a distinction between the manner of death and the other "facts" contained in the death certificate. 268 Md. at 608–09, 303 A.2d at 788. The Maryland death certificate form, however, no longer contains the word "opinion" in the section calling for manner of death. This change is significant because our decision in *Benjamin* relied to some extent on the intentional use of this word.

**4.** In 1939, the Maryland legislature created the Department of Post Mortem Examiners. *See* Md.Code (1939, 1951 Repl.Vol.), Art. 22, § 1. The medical examiner replaced the office of the coroner. *See Benjamin,* 268 Md. at 608, 303 A.2d at 788. The coroners' power to summon a jury of inquisition, however, did not transfer to the office of the medical examiner. *See id. Compare* Md.Code (1939, 1951 Repl.Vol.), Art. 22, § 9 *with* Md.Code (1982, 1994 Repl.Vol.), Health–General Art., § 5–312. As a result, according to *Benjamin,* the legislature evidently relegated all non-medical investigative duties formerly held by coroners to the Office of the State's Attorney for Baltimore City and each respective county in Maryland.

forth the procedures for the medical examiner to follow where death occurs as a result of, for example, suicide, violence, etc. Where such deaths occur, § 5–309 requires the medical examiner to investigate. Section 5–311 requires the medical examiner to keep complete records of each such case. As part of the medical examiner's investigation, the medical examiner receives notice from the police or sheriff of "facts concerning the time, place, manner, and circumstances of the death." § 5–309(b). The medical examiner shall perform an autopsy if the medical examiner considers it necessary. § 5–310. If so, the autopsy report is attached to the record of the medical examiner's case pursuant to § 5–311(b). After the medical examiner's report and autopsy are completed and after performing an investigation, the medical examiner then "deliver[s] to the State's Attorney for the county where the body was found a copy of each record that relates to a death for which the medical examiner considers further investigation advisable." § 5–311(c). This record [5] can be used as "competent evidence in any court in this State of the matters and facts contained in it." § 5–311(d)(2).

Before 1990, it was the practice of the medical examiner to record the manner of death on a death certificate form.[6] It was not until a 1990 amendment to the Health–General Article, however, that the legislature specifically added "manner of death" to the list of items [7] that a medical examiner was to record in the records of each case. *See* Chapter 238 of the Acts of 1990 (amending § 5–311(a)(2)(iii)). At that time, the legislature did not define manner of death, nor did it mandate how manner of death should be expressed in the medical examiner's records.

---

**5.** Record "[m]eans the result of a view or examination of or an autopsy on a body" but "[d]oes not include a statement of a witness or other individual." § 5–311(d).

**6.** *See supra* note 3.

**7.** Section 5–311(a)(2)(iii) also requires the medical examiner to record the date and cause of death.

■ The issue in the instant case is, thus, whether a medical examiner may testify to a finding, *i.e.*, manner of death, which he or she is required by law to denote and record for possible use at trial. To create a *per se* rule prohibiting such testimony would be akin to holding that medical examiners are not qualified to determine manner of death, or that medical examiners' findings are generally unreliable evidence in a court of law. We choose not to do so, for the wisdom of our legislature has guided us in a different direction. When this Court decided *Benjamin*, determining manner of death was merely "incumbent upon [medical examiners] in completing the [death certificate] form." 268 Md. at 609, 303 A.2d at 788. By specifically adding the words "manner of death," however, the 1990 statutory amendment made it abundantly clear that the legislature intended to bring the determination of manner of death into the province of the medical examiner's duties.

Prior to the 1990 amendment, the Court of Special Appeals upheld the trial court's admission of a medical examiner's opinion as to a child's manner of death in *Terry v. State*, 34 Md.App. 99, 366 A.2d 65 (1976). In *Terry*, Mary Alice Terry was convicted of child abuse and second-degree murder of her five-year-old son. At trial, an assistant medical examiner testified that the child's death " 'resulted from cumulative effects of repeated child abuse.' " *Terry*, 34 Md.App. at 102–03, 366 A.2d at 67. The medical examiner was later asked to give an opinion as to the child's manner of death. *Terry*, 34 Md.App. at 104, 366 A.2d at 68. Over Terry's objection, the medical examiner testified: " 'In view of the evidence presented I come to the conclusion that the manner of death is to be considered as homicide.' " *Terry*, 34 Md.App. at 105, 366 A.2d at 68. On appeal, the Court of Special Appeals found *Benjamin* to be inapposite on the issue of a medical examiner's opinion testimony on manner of death. *Terry*, 34 Md.App. at 107, 366 A.2d at 70. As the intermediate appellate court explained:

"In spite of the suggestion by the Court [in *Benjamin* ] that the investigative duties of medical examiners are limited by

law to 'essential facts concerning the medical causes of death,' we cannot conceive that this precludes calling the medical examiner as an expert witness to express his opinion in a case. Once called, testifying under oath, subject to the requirement that he state the basis for his conclusion and be subject to cross-examination, an entirely different situation exists than an effort to introduce that opinion into evidence solely on the basis of a death certificate." (Citation omitted).

*Terry,* 34 Md.App. at 107–08, 366 A.2d at 70. We believe *Benjamin* is similarly inapplicable here. Consequently, we reject Sippio's request to extend *Benjamin* to include the prohibition *per se* of a medical examiner's testimony regarding manner of death.

Our inquiry, however, does not end here. Dr. Smialek's testimony, as with all lay and expert opinion testimony, is subject to certain requirements in order to qualify as admissible evidence in a court of law. We must now decide whether Dr. Smialek's testimony as to manner of death was properly admitted into evidence.

## C.

 Under the well-established Maryland common law of evidence, it is within the sound discretion of the trial court to determine the admissibility of expert testimony. *See Simmons v. State,* 313 Md. 33, 41, 542 A.2d 1258, 1262 (1988); *State v. Allewalt,* 308 Md. 89, 101, 517 A.2d 741, 747 (1986); *Nizer v. Phelps,* 252 Md. 185, 192, 249 A.2d 112, 116 (1969). The Maryland Rules of Evidence, adopted by this Court in 1994, did not limit that discretion. *See* Maryland Rule 5–702. A trial court's ruling either admitting or excluding such testimony "will seldom constitute a ground for reversal." *Radman v. Harold,* 279 Md. 167, 173, 367 A.2d 472, 476 (1977). Such a ruling, however, may be reversed on appeal "if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion." *Id.*

■ According to Md. Rule 5–702, which codified the modern common-law rule regarding expert testimony, a trial court must determine whether the evidence to be presented is a proper subject of expert testimony. The inquiry turns on whether the trier of fact will receive appreciable help from the expert testimony in order to understand the evidence or to determine a fact in issue. *See Simmons,* 313 Md. at 41, 542 A.2d at 1262; *Bloodsworth v. State,* 307 Md. 164, 184–85, 512 A.2d 1056, 1066 (1986)(quoting *Shivers v. Carnaggio,* 223 Md. 585, 588–89, 165 A.2d 898, 900 (1960)). The trial court need not consider whether the trier of fact could possibly decide the issue without the expert testimony. *Nizer v. Phelps,* 252 Md. at 193, 249 A.2d at 117. Nor must the subject of the expert testimony be so far beyond the level of skill and comprehension of the average layperson that the trier of fact would have no understanding of the subject matter without the expert's testimony. 6 LYNN MCLAIN, MARYLAND EVIDENCE § 702.1, at 212–13 (1987).

■ In ascertaining whether expert testimony will be helpful to the trier of fact, a trial court must instead determine whether certain requirements have been satisfied: (1) the proposed witness must be qualified to testify as an expert; (2) the subject matter about which the witness will testify must be appropriate for expert testimony; and (3) there must be a legally sufficient factual basis to support the expert's testimony. Md. Rule 5–702; *see also Simmons,* 313 Md. at 41–42, 542 A.2d at 1262. Here all three requirements are met.

■ First, Dr. Smialek was qualified to testify as an expert in the area in which he was testifying. In order to determine whether a proposed witness is qualified to testify as an expert, the trial court must examine whether the witness has sufficient knowledge, skill, experience, training, or education pertinent to the subject of the testimony. *See* Md. Rule 5–702(1); *see also Simmons,* 313 Md. at 41, 542 A.2d at 1262; *Crews v. Director,* 245 Md. 174, 179, 225 A.2d 436, 439 (1967). In the instant case, we find no merit to Sippio's assertion that Dr. Smialek's expertise as a forensic pathologist did not

qualify him to render an opinion as to manner of death. Dr. Smialek was qualified as an expert in forensic pathology without challenge by the defense. Moreover, Dr. Smialek explained that forensic pathologists are "trained to recognize certain patterns of injury and [have] to be familiar with gunshot wounds ... so that [they] can render a proper diagnosis in an attempt to reconstruct the events surrounding the sudden death of an individual." His testimony as to manner of death was, therefore, consistent with his extensive medical training and professional experiences.

Second, the subject matter about which Dr. Smialek testified was appropriate for expert testimony. *See* Md. Rule 5–702(2). To properly conclude this, the trial court must determine, in essence, whether the subject matter is beyond the proper realm of expert opinion testimony. *See, e.g., Simmons,* 313 Md. at 47, 542 A.2d at 1265; *see also Stebbing v. State,* 299 Md. 331, 347–48, 473 A.2d 903, 910–911, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Here, Dr. Smialek personally performed the autopsy on Branch. He described the nature of the fatal gunshot wound in an articulate and concise manner so that the jury could understand the exact cause of death. On cross examination, Dr. Smialek testified that the density of gun powder residue found on her skin indicated that the gunshot was fired at close range to Branch's head. He also testified that he had received information from Detective Steinhice prior to performing the autopsy as to the circumstances surrounding the shooting. On recross examination, Dr. Smialek testified:

"[Dr. Smialek:] I had information that [Sippio] had told the police that he had shot Ms. Branch.

[Defense Counsel:] And did that aid you in coming up with the conclusion that it was not a natural, accidental, suicidal or undetermined cause of death?

[Dr. Smialek:] I considered that information together with the physical findings on the body, the fact that the wound was not a typical contact gunshot wound such as I would see in a suicide.

So that the form from the investigation together with my findings at the autopsy allowed me to reach a conclusion that this was a homicide, which means that *someone else fired a weapon to kill Ms. Branch.*" (Emphasis added).

Although suicide was not an issue raised in this case, Dr. Smialek's professional training and experience enabled him to reject this potential manner of death. The nature of the gunshot wound to Branch's head was consistent with a finding of homicide. Dr. Smialek's finding that the gun was discharged at a distance of four to eight inches from Branch's head, in conjunction with the path of travel of the discharged bullet, enabled Dr. Smialek to reject the shooting as an accident.

Moreover, Dr. Smialek aided the jury by distinguishing between homicide and accident. The pertinent testimony is as follows:

"[Defense Counsel:] If a shooting is an accidental shooting and you examined the body of that accident victim not knowing whether it is an accident or not, and the cause of death is a gunshot wound to the head, would you use the block homicide to check off your findings?

[Dr. Smialek:] I'm not sure I understand your question.

If the information available to me indicates that a gunshot wound was the result of an accident such as a gun falling onto a floor and discharging, I would call [it] an accident.

Is that what the form from the investigation to go with my examination led me to believe? I would not call an accident a homicide. I wouldn't call a homicide an accident."

Dr. Smialek testified further:

"[Defense Counsel:] And homicide has a lot of different categories, does it not, sir?

[Dr. Smialek:] Legally there are categories for homicides, yes.

[Defense Counsel:] What would those categories include, if you know?

* * *

[Dr. Smialek:] There are categories that include self defense, categories that allow a homicide that's caused in the course of say police action to be excusable.

Those are some of the categories.

Self defense is a categorization of homicide.

[Defense Counsel:] All of that would be included under your check mark of homicide, correct?

[Dr. Smialek:] I don't consider those particular factors.

What leads to the homicide, whether it was intentional or unintentional in reaching my conclusion, those are legal issues.

[Defense Counsel:] So intent, what caused that person to be on your table, is not part of your conclusion in this report, is that correct?

[Dr. Smialek:] That's right. The intent of the person who pulls the trigger isn't something that I can consider."

It is conceivable that, without explanation, the term homicide suggests to the average layperson a degree of culpability greater than accident. This, however, supports our view that Dr. Smialek's testimony was helpful to the jury. Without Dr. Smialek's testimony, the jurors may have concluded that the word homicide, referred to in the medical examiner's report that was admitted into evidence, connoted a degree of culpability greater than its definition allows. Dr. Smialek's testimony, in essence, neutralized the unexplained manner of death listed on the autopsy report previously admitted into evidence.

 In concluding that the subject of Dr. Smialek's testimony was appropriate for expert testimony, we also reject Sippio's contention that Dr. Smialek's opinion testimony was inadmissible because it resolved a conflict in the evidence and because it related to the credibility of a witness. Dr. Smialek's testimony as to manner of death did not resolve a conflict in the evidence. Expert opinion testimony, like any opinion testimony, is designed to introduce, bolster, or place doubt on evidence properly admitted before the trial court. The fact

that Petitioner and Respondent have different theories of Branch's death in no way precludes either party from introducing evidence that tends to support or place doubt on previously admitted evidence. Similarly, Dr. Smialek's testimony did not resolve a question of Sippio's credibility merely because Sippio denied the shooting was deliberate. Had Dr. Smialek testified that Sippio's credibility was questionable based on statements Sippio made before or during trial, an exclusion of such testimony might have been proper. Dr. Smialek, however, did not opine on Sippio's credibility.

 Finally, there was a sufficient factual basis to support Dr. Smialek's testimony. *See* Md. Rule 5–702(3); *see also State Health Dep't v. Walker*, 238 Md. 512, 520, 209 A.2d 555, 559–60 (1965)(stating "[t]he facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess"). A factual basis for expert testimony may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions. 6 LYNN MCLAIN, MARYLAND EVIDENCE, § 703.1, at 236–37 (1987). Here, Dr. Smialek's examination of Branch, in conjunction with his statutorily-mandated discussion with Detective Steinhice concerning the circumstances of the shooting, *see* § 5–309(b), provided Dr. Smialek with a sufficient factual basis from which to testify as to manner of death. His finding of homicide was, thus, not the result of conjecture or guess. Rather, it was supported by medical facts determined by Dr. Smialek himself as well as relevant information obtained from a reliable police source.

### D.

 Sippio also argues that Dr. Smialek's opinion on manner of death was a legal conclusion "appropriately committed to the judgment of the trier of fact." This is tantamount to arguing that Dr. Smialek's opinion was inadmissible because it went to the ultimate issue reserved for the jury to decide. We

reject this contention for two reasons. First, Md. Rule 5–704(a) specifically provides that opinion testimony "otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact." If the opinion testimony of an expert does embrace an ultimate issue to be decided by the jury, the court determines whether the testimony is helpful to the trier of fact under Md. Rule 5–702. The exception to Md. Rule 5–704(a) is that an expert is specifically precluded by rule from testifying to whether a defendant possessed the requisite mental state that constitutes "an element of the crime charged." Md. Rule 704(b). Although the ultimate issue in this case was whether Sippio possessed the requisite mental state for murder, this, as we shall discuss below, was not the subject of Dr. Smialek's testimony.

Second, whether Branch's death was a homicide was not the ultimate issue in this case, and Dr. Smialek's opinion on Branch's manner of death was not a legal conclusion reserved for the trier of fact. Homicide is the "killing of one human being by the act, procurement, or omission of another." BLACK'S LAW DICTIONARY 734 (6th ed.1990). Similar definitions of homicide are found in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED, at 1083 (Philip B. Gove ed., 1986) and THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED, at 914 (2d ed.1987) both of which define homicide as "a killing of one human being by another." In fact, the term homicide descended originally from the Latin term "homicidium" meaning "killing." THE RANDOM HOUSE DICTIONARY OF ENGLISH LANGUAGE, UNABRIDGED, at 914 (2d ed.1987). Significantly,

> "Homicide is not necessarily a crime. It is a necessary ingredient of the crimes of murder and manslaughter, but there are other cases in which homicide may be committed without criminal intent and without criminal consequences.... The term 'homicide' is neutral; while it describes the act, it pronounces no judgment on its moral or legal quality."

BLACK'S LAW DICTIONARY 734 (6th ed.1990); *see also People v. Mahon,* 77 Ill.App.3d 413, 32 Ill.Dec. 569, 395 N.E.2d 950, 958 (1979)(concluding that it was proper to instruct the jury that " '[h]omicide is a comprehensive word which means any killing of a human being. It does not necessarily import a crime.' "). In the instant case, it is undisputed that Sippio *killed* Branch. The overwhelming evidence at trial, including Sippio's own admission that he shot Branch, supports this finding. Thus, this issue was never in dispute for the jury; they could not have reached any other conclusion but that Sippio committed a homicide.

What was in dispute at trial was whether Sippio shot Branch *intentionally or accidentally.* Intent, therefore, was the ultimate issue in this case. To secure a conviction of first- or second-degree murder, the State bore the burden to prove beyond a reasonable doubt that Sippio intentionally shot Branch. Only the jury could decide whether Sippio possessed the requisite mental state for such a conviction. The jury could excuse criminal culpability for an accidental shooting like the one Sippio describes. Before the jury could assess criminal culpability, however, it had to decide whether a homicide had even occurred. Dr. Smialek did not testify to Sippio's intent, but rather merely testified that Branch's death occurred as a result of a homicide. In fact, Dr. Smialek clearly testified that intent was not a factor in his determination of manner of death. As properly explained by Dr. Smialek himself, homicide in itself does not equate to criminal culpability; instead it is the killing of one human being by another human being, *regardless* of the intent of the party who commits the act. We, thus, find no merit to Sippio's contention that Dr. Smialek's testimony invaded the province of the jury.

We, therefore, conclude that Dr. Smialek's expert testimony met the standards for admissibility pursuant to Md. Rule 5–702 and supporting case law. His testimony was obviously helpful to the jury and did not encroach on the province of the jury to decide the ultimate issue in the case. Furthermore, his testimony was based on a sufficient factual foundation and supported by his qualifications as an expert witness. Thus,

the trial court did not err in allowing, over the objections of the defense, Dr. Smialek's testimony as to manner of death.

Because of the unique facts in the instant case, however, our holding today is limited. As we discussed earlier, the medical examiner's report from which Dr. Smialek testified was admitted into evidence without Sippio's objection, unlike in *Benjamin*, where the death certificate was excluded upon objection by the non-offering party. We are, therefore, not asked to address whether the medical examiner's report prepared by Dr. Smialek would have been excluded from evidence had Sippio objected to its admission. By failing to object to its admissibility, Sippio waived the ability to preserve the issue for appeal, and the medical examiner's report, with the manner of death portion marked "homicide," was admitted for the jury to examine. Dr. Smialek's testimony, referring to the manner of death portion of the report, simply reiterated information properly admitted by the court. In addition, Dr. Smialek properly testified to his opinion and was available for cross-examination. We note that if a medical examiner's report is admissible as an official record pursuant to Md. Rule 5–803(8), it makes sense that the jury should be informed about the meaning of the term "homicide" and that it connotes no culpable state of mind.

### E.

We also note that other jurisdictions have generally been willing to allow such testimony. While not all states use the same terminology as Maryland, a number of states have addressed factual circumstances where medical experts testified that wounds or other traumatic injuries to the deceased were caused accidentally, by self-infliction, or by the act of another person or persons. With the exception of Minnesota, states that have addressed the issue have suggested they would allow this type of opinion testimony if certain requirements are met.

The majority of states allowing this type of opinion testimony have done so if the opinion is within the expert's field of

expertise and is helpful to the trier of fact. *See, e.g., Medlock v. State,* 263 Ga. 246, 430 S.E.2d 754, 756–57 (1993); *State v. Byles,* 652 So.2d 59, 61–62 (La.Ct.App.1995)("A physician testifying as an expert may properly give an opinion as to the probable manner in which a wound or other traumatic injury was inflicted where such testimony is based on facts within the expert's knowledge."); *Com. v. Pikul,* 400 Mass. 550, 511 N.E.2d 336, 339 (1987); *State v. Jones,* 59 Wash.App. 744, 801 P.2d 263, 267 (1990)("[U]nder the facts and circumstances presented, the doctors were better qualified than jurors to adjudge the cause of death and whether the fatal blow was accidental or inflicted."), *review denied,* 116 Wash.2d 1021, 811 P.2d 219 (1991); *State v. Smith,* 178 W.Va. 104, 358 S.E.2d 188, 191 n. 1 (1987).

In *Medlock,* for example, the court concluded that the expert's testimony was admissible because it was helpful to the trier of fact in that "the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; *i.e.,* the conclusion is beyond the ken of the average layman." 430 S.E.2d at 756 (internal citations and quotations omitted). There, a pathologist who performed the autopsy on the infant victim testified at trial that the manner of death was homicide. *Id.* The *Medlock* court ruled that the expert's opinion "that the infant's death resulting from shaking could only be homicide merely reiterated and underscored his opinion that death in this case resulted from shaking, rather than by accident or by intentional causes." *Id.* That opinion, the court concluded, was helpful because it was beyond the ken of the average layman. Moreover, because the jury could not reach any conclusion, based on the expert's testimony, other than that the death was by homicide, the testimony did not invade the province of the jury. *Medlock,* 430 S.E.2d at 757. The court suggested, however, that had the expert testified that the infant died as a result of blunt force trauma to the head, it would have been impermissible to allow the opinion that the manner of death was homicide because the jury would have been able to conclude from the evidence presented

whether the death occurred accidentally or by intentional cause. *Medlock*, 430 S.E.2d at 756–57.

In *Pikul*, three expert physicians, two of whom assisted in performing the autopsy on a three and one-half-year-old female, testified that the child's manner of death was traumatic sexual asphyxia, or forced oral sex. 511 N.E.2d at 339. The reviewing court noted that such testimony, if within the expert's area of expertise, is admissible as long as it aids the jury. *Id.* The court also stated that, "[a]n expert who has performed an autopsy may testify that the injuries observed could have been caused in a particular way or by a specified instrumentality." *Id.*

Other jurisdictions have suggested that such opinion testimony, while excluded in the particular case, may have been properly admitted had it been within the expert's field of expertise or helpful to the trier of fact. *See, e.g., People v. Perry*, 229 Ill.App.3d 29, 170 Ill.Dec. 823, 593 N.E.2d 712, 716 (1992) ("[Pathologist's] opinion as to homicide ... did not in any way add to the evidence already presented to the jury or assist them in reaching their own conclusions."); *State v. Vining*, 645 A.2d 20, 21 (Me.1994) (holding that medical examiner's conclusion that victim died as a result of homicide was inadmissible because the conclusion was not a product of her expertise, but rather merely based on her conversations with police investigators); *State v. Jamerson*, 153 N.J. 318, 708 A.2d 1183, 1195 (1998); *State v. Bragan*, 920 S.W.2d 227, 246 (Tenn.Crim.App.1995).

In *Jamerson*, for example, the court reviewed a defendant's conviction for two counts of second-degree reckless manslaughter based in part on operating a motor vehicle while under the influence. 708 A.2d at 1186. There, a county medical examiner testified at trial that the defendant committed "vehicular homicide," as opposed to a "vehicular accident," when his car struck another car, resulting in the eventual deaths of an elderly couple who were in the other vehicle at the time. *Jamerson*, 708 A.2d at 1189. The court ruled that it was improper to have allowed this testimony because expert

testimony should only be permitted if it will assist the trier of fact in understanding the evidence or in determining a fact at issue. *Jamerson,* 708 A.2d at 1194–95. The expert, who was qualified in forensic pathology, should have been limited to testifying to "the physical properties of the implement that caused the [decedents'] deaths, narrating the physiological status of the bodies at the time of death, and ruling out the possibility that the injuries were self-inflicted or sustained as a result of mere inadvertence." *Jamerson,* 708 A.2d at 1193. Testifying that the collision was a homicide, however, went beyond the expert's area of expertise. *See Jamerson,* 708 A.2d at 1194. The court noted that the jury was as competent as the expert to analyze the evidence—witness statements, blood-alcohol level of the defendant, position of the cars at the point of impact—and determine whether the collision was an accident or a homicide. *Jamerson,* 708 A.2d at 1195.

Several jurisdictions allow opinion testimony of this nature when the testifying expert was the preparer of the autopsy report or the expert's opinion was based on inferences drawn from evidence presented to the trier of fact. *See, e.g., Wright v. State,* 266 Ind. 327, 363 N.E.2d 1221 (1977); *Pikul,* 511 N.E.2d at 340 n. 3 ("Even where an expert may have been exposed to hearsay in the investigation of the case, his opinion may be admitted where based 'primarily, if not exclusively, on facts [the expert] himself observed and testified to.'" (Citation omitted)); *State v. Chew,* 150 N.J. 30, 695 A.2d 1301 (1997). In *Wright,* for example, the physician, who performed the autopsy on a twenty-one-month-old child, died before the commencement of the trial, and a deputy coroner was permitted to testify to the findings in the report. 363 N.E.2d at 1228. The reviewing court emphasized that the deputy coroner's testimony was based upon the autopsy report and autopsy photographs previously admitted into evidence. *Wright,* 363 N.E.2d at 1229. As long as the deputy coroner was properly qualified in the area of forensic pathology, the court ruled he was qualified to testify to manner and cause of death based on the sufficient factual basis before the court, *i.e.,* the

previously admitted autopsy report and photographs. *See Wright,* 363 N.E.2d at 1229.

Likewise, in *State v. Chew,* the county medical examiner testified that "crisscross scratches" were found on the victim's face, and that the wounds were made while the victim was " 'either restrained or certainly not moving . . . [and] were deliberate.' " 695 A.2d at 1331. The Supreme Court of New Jersey held that such testimony was permissible, because photographs of the victim's wounds were previously admitted into evidence. *Id.* The court stated: "To have omitted [the medical examiner's testimony] may have confused the jury" because the wounds were clearly visible in the photographs. *Id.* Moreover, the jurors were allowed to consider testimony on manner of death during the guilt-innocence phase of the trial, but were specifically instructed not to consider such testimony during the penalty phase of the trial. *Id.* Similarly, in the instant case, the medical examiner's report indicating that Branch died as a result of a homicide was in evidence and might have confused the jury absent further explanation.

Several jurisdictions specifically allow opinion testimony of this nature despite its presentation in the form of an ultimate issue reserved for the trier of fact. *See, e.g., Pikul,* 511 N.E.2d at 339 (" '[U]nder modern standards, expert testimony on matters within the witness's field of expertise is admissible . . . even if the expert's opinion touches on the ultimate issues that the jury must decide.' " (Citation omitted)); *Jones,* 801 P.2d at 267 ("Although the [experts'] conclusions touch on the ultimate issue, that in itself does not make the testimony inadmissible"); *Smith,* 358 S.E.2d at 191 n. 1. In *Smith,* for example, a state medical examiner testified that the gunshot wound that caused the victim's death was not self-inflicted. 358 S.E.2d at 191. The defense argued that this opinion was impermissible under the court's prior holding in *State v. Clark,* 171 W.Va. 74, 297 S.E.2d 849, 853 (1982), where the court concluded that the medical examiner's testimony in that case as to manner of death invaded the "fact finding function of the jury by making the ultimate factual—legal conclusion that is central to an element of the crime." The reviewing court in

*Smith,* however, implicitly indicated that the testimony was admissible because, since its ruling in *Clark,* the court had adopted Rule 704 of the West Virginia Rules of Evidence, allowing expert opinion testimony despite its presentation in the form of an ultimate issue. 358 S.E.2d at 191 n. 1. We note that West Virginia Rule of Evidence 704 is substantively identical to Md. Rule 5–704.

Courts in several jurisdictions have concluded that opinion testimony of this nature did not encroach on the ultimate issue reserved for the trier of fact. *See, e.g., Maxwell v. State,* 263 Ga. 57, 428 S.E.2d 76, 77 (1993)("Because [the expert's] testimony [regarding the possibility of death by a single blow] pertains to conclusions jurors would not ordinarily be able to draw for themselves, it does not invade the jury's province."); *Byles,* 652 So.2d at 62 (finding that medical expert had expressed opinion that cause of death was strangulation and that victim was restrained in some fashion, but had "not express[ed] an opinion on the guilt or innocence of the accused, the ultimate fact to be decided by the jury"); *State v. Young,* 662 A.2d 904, 907 (Me.1995). In *Young,* for example, the Supreme Judicial Court of Maine found that the medical examiner's testimony that the victim's manner of death was homicide was properly admitted at trial, because the testimony neither exceeded the expert's field of expertise nor invaded the province of the jury. 662 A.2d at 907. Significantly, the *Young* court noted, the medical examiner's opinion did not purport to address the defendant's state of mind at the time of the killing, a factor which caused similar testimony to be excluded in *State v. Flick,* 425 A.2d 167, 171 (Me.1981).

Finally, Pennsylvania has allowed opinion testimony as to manner of death where the opinion is stated within a reasonable degree of medical certainty. *See, e.g., Com. v. Floyd,* 499 Pa. 316, 453 A.2d 326, 328 (1982); *Com. v. Hart,* 348 Pa.Super. 117, 501 A.2d 675, 677 (1985). In *Floyd,* the medical examiner testified that, within a reasonable degree of medical certainty, the manner of the victim's death was homicide. 453 A.2d at 327. The Supreme Court of Pennsylvania found that there was "adequate evidence in the record of causation for the

finder of fact to conclude beyond a reasonable doubt that the cause of death was a criminal act," and, therefore, the expert's opinion was properly admitted. *Floyd,* 453 A.2d at 328. The court quoted *Commonwealth v. Stoltzfus,* 462 Pa. 43, 337 A.2d 873, 879 (1975), for the proposition that: "[I]t is only necessary that the [medical examiner] entertain a 'reasonable degree of medical certainty' for his conclusions." *Floyd,* 453 A.2d at 328. In *Hart,* a medical examiner testified that the child's manner of death was homicide based on the extensive injuries to the child's head, buttocks, and thighs. 501 A.2d at 676–77. The court concluded that this testimony, stated within a reasonable degree of medical certainty, "established far more than a *probability* that [the child's] death was caused by a criminal act." *Hart,* 501 A.2d at 677. Our opinion today that Dr. Smialek's testimony was properly admitted is, thus, consistent with case law in other jurisdictions.

### III.

The second issue on appeal involves the introduction of character evidence regarding Sippio's character for truthfulness. Before Sippio testified at trial, Sippio called Michael Martin as a character witness to testify that Sippio had a good character for truthfulness. The State objected, and the trial court sustained the objection. Sippio was subsequently called as the last witness for the defense.

▆▆▆▆ *Sahin v. State, supra,* is the seminal Maryland case on this issue. In *Sahin,* this Court held that "a criminal defendant on trial for a veracity impeaching offense[8] may, *after* testifying, offer evidence of his or her good character for truthfulness." 337 Md. at 307, 653 A.2d at 453 (emphasis added). Sippio urges this Court to interpret our previous

---

8. A veracity impeaching offense is defined as one that is "so relevant to credibility that convictions of the crime may be used to attack the credibility of a witness." *Sahin v. State,* 337 Md. 304, 307 n. 1, 653 A.2d 452, 453 n. 1 (1995). An offense qualifies as such if it meets the test set out in Maryland Rule 5–609, which shall include "an infamous crime [*e.g.,* treason, *crimen falsi,* and felonies under the common law] or other crime relevant to the witness's credibility." *Id.*

holding in *Sahin* to allow a criminal defendant to present evidence of his or her good character for truthfulness *before* that defendant testifies at trial. We decline to do so.

Prior to *Sahin*, the rule in Maryland and the majority of jurisdictions was that character evidence for truthfulness would be allowed only after a defendant's character for truthfulness had been sufficiently attacked. *See Sahin*, 337 Md. at 313, 653 A.2d at 457.[9] The fact that a defendant had been charged with a crime or that the State's witnesses contradicted the defendant's testimony did not constitute an attack sufficient to allow such character testimony, according to the majority position. *See Sahin*, 337 Md. at 316, 653 A.2d at 458. The decision in *Sahin*, on the other hand, permits a criminal defendant to present character evidence for truthfulness merely by testifying, thus branding the State's bringing of criminal charges and presentation of evidence as a sufficient attack on a defendant's character for truthfulness. *See Sahin*, 337 Md. at 314, 653 A.2d at 457.[10]

In *Sahin*, we explained the reasoning for our departure from the majority position. 337 Md. at 316–22, 653 A.2d at 458–61. We concluded that the charging document and prosecutor's evidence that the defendant committed a veracity impeaching offense is an attack on the defendant's character for truthfulness. *Sahin*, 337 Md. at 314, 653 A.2d at 457. Thus, just as a defendant is entitled to introduce evidence of good character as a defense to a charge, *see* Md. Rule 5–

---

9. Federal Rule 608 reads in pertinent part:

 "(a) **Opinion and reputation evidence of character.** The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible *only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.*" (Emphasis added).

10. Maryland Rule 5–608, adopted by the Court of Appeals in 1994, differs slightly from its federal counterpart mainly in style and organization, but not in substance. Although this rule was not in effect at the time of the trial court's decision in *Sahin*, it remains consistent with this Court's ruling in *Sahin*.

404(a)(1)(A)("Evidence of a pertinent trait of character of an accused offered by the accused, or by the prosecution to rebut the same [is admissible]."), a criminal defendant on trial for a veracity impeaching offense who testifies should be able to present favorable evidence of his or her character for truthfulness. *See Sahin,* 337 Md. at 322, 653 A.2d at 461. The thrust of the *Sahin* decision, however, is that a criminal defendant *must* testify to present such evidence. Absent this testimony, a defendant's character for truthfulness is not relevant because that defendant has not placed his or her veracity in question.

Yet Sippio would urge us to stretch the bounds of our minority position even further by removing altogether the requirement that a criminal defendant must testify before presenting evidence of his or her good character for truthfulness. To do so would enable a criminal defendant to bolster his or her character for veracity without placing that character trait at issue. Had Sippio not testified and had the trial court allowed Michael Martin to testify to Sippio's good character for truthfulness, the jury would be left to wonder, "Truthful to what? The defendant didn't say anything!" We must therefore adhere to the requirement in *Sahin* that a criminal defendant on trial for a veracity impeaching offense must testify before [11] presenting evidence of his or her good character for truthfulness.

We also reject Sippio's contention that the likelihood that a defendant will testify is sufficient to warrant the introduction of that defendant's good character for truthfulness. Sippio claims that his counsel, in opening statement to the jury, "promised" that Sippio would testify that the shooting death of Branch was accidental. Sippio's defense was

---

11. Of course, this requirement does not prohibit a judge from exercising discretion under Md. Rules 5–104(b) and 5–611(a) to vary the order of proof upon the defendant's request and upon assurances that the defendant will testify. A request to vary the order of proof was not made in the instant case, and the judge did not err in refusing to exercise discretion to allow the veracity character testimony before the defendant testified.

predicated on the theory of accident, which, Sippio contends, cannot be proven in most cases unless the defendant takes the witness stand. Thus, according to Sippio, these factors made him a *testifying* defendant within the meaning of *Sahin* and Md. Rule 5–608. We disagree. Although the nature of the State's charge and the defense theory may contribute to the heightened probability that a criminal defendant will testify at trial, the well-established protection remains that a criminal defendant is not *bound* in any fashion to testify in his own defense. *See* U.S. CONSTITUTION amend. V; MARYLAND CONSTITUTION, DECLARATION OF RIGHTS, Art. 22. Similarly, Sippio's "promise" to testify during opening argument was not binding on Sippio. *See McLhinney v. Lansdell Corp. of Md.,* 254 Md. 7, 13, 254 A.2d 177, 180 (1969)(noting that assertions made during opening statement are not admissible to establish the attorney's theory of the case, but may fall under the category of admissions made by an attorney, acting as his client's agent within the scope of his or her authority). Although Sippio did testify at trial, he was not bound to do so. We therefore find that Sippio was not a testifying defendant within the meaning of *Sahin* or Md. Rule 5–608.[12]

The mere announcement by a criminal defendant that he or she will testify, absent a formal proffer to the court that the defendant will testify in conjunction with permission of the court to vary the order of proof, is clearly insufficient to warrant evidence of a defendant's good character for truthfulness. While trial judges may vary the order of proof based on

---

**12.** Sippio contends that requiring a criminal defendant to first testify before presenting character evidence for truthfulness exalts form over substance. As we noted earlier, however, Md. Rules 5–104(b) and 5–611 afford the trial court discretion over the mode and order of interrogating witnesses and presenting evidence. Thus, a criminal defendant, by way of formal proffer, may request that a trial court hear the testimony of a character witness, including evidence of the defendant's character for truthfulness, *before* the defendant testifies. The trial court's discretion to change the order of testifying witnesses is consistent with this Court's ruling in *Sahin* because the trial court still adheres to the condition in *Sahin* that a criminal defendant must testify in order to present evidence of his or her character for truthfulness.

a proffer or condition, the judge is not required to do so. *See* Md. Rules 5–104(b) and 5–611(a). The trial court, therefore, did not err by refusing to permit Michael Martin to testify that Sippio possessed a good character for truthfulness prior to Sippio's actual testimony.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**