### S93A0053. MEDLOCK v. THE STATE.
(430 SE2d 754)

HUNT, Presiding Justice.

Jason Ronald Medlock was convicted of the felony murder of his infant son and was sentenced to life imprisonment.[1] Medlock appeals and we affirm in part and remand in part.

1. Considering the evidence in a light most favorable to the verdict, we conclude that a rational trier of fact could have found Medlock guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Medlock contends the trial court erred in overruling his objections to the state's cross-examination of Medlock's character witnesses. We agree.

In cross-examining Medlock's character witnesses, the state asked one of them about two prior disorderly conduct charges and a charge of driving an automobile faster than is safe for conditions. The state asked another about two disorderly conduct charges, a DUI, and a criminal trespass charge. In both instances, Medlock objected to the questions and asked that the state produce certified copies documenting the charges. The district attorney refused to produce anything to show that his questions were asked in good faith and were based upon reliable information, insisting that he had no obligation to do so and that it was Medlock's responsibility to show that there was no merit to the state's questions. The trial court overruled Medlock's objections and informed Medlock that he could rebut when the state had completed its cross-examination.

In *Nassar v. State,* 253 Ga. 35, 36 (315 SE2d 903) (1984), a murder case that did not involve the death penalty, we noted that, where the state had made an offer of proof concerning prior arrests and convictions of the defendant, it was not error for a trial court to permit the state to cross-examine a defendant's character witnesses concerning whether or not they knew about those prior arrests and convictions. Four years later, in *State v. Clark,* 258 Ga. 464 (369 SE2d 900)

---

[1] The crime occurred on December 17, 1991 and Medlock was indicted on March 9, 1992. He was tried beginning on March 30, 1992; the jury returned its verdict on April 1, 1992 and the sentence was filed on April 2, 1992. Medlock's motion for new trial, filed April 23, 1992, and amended on July 29, 1992, was denied on September 15, 1992. He filed his notice of appeal on September 21, 1992. The case was docketed in this court on October 15, 1992 and submitted for decision without oral argument on November 27, 1992.

(1988), a case involving a voluntary manslaughter conviction, we plainly stated:

> The purpose of this opinion is to delineate the boundaries that *must* be observed by district attorneys when cross-examining a defendant's character witness. A district attorney *must* be able to show that the questions posed to the defendant's character witness were asked in good faith and based on reliable information that can be supported by admissible evidence.

(Emphasis supplied.) Three years later, in *Christenson v. State*, 261 Ga. 80 (402 SE2d 41) (1991), a death penalty case prosecuted by the *same* district attorney who prosecuted the present case and decided *one year prior* to the trial of the present case, we cited both *State v. Clark*, supra, and *Nassar v. State*, supra, and held:

> Where the defendant objects to the district attorney's questions to the defendant's character witnesses about offenses, . . . the district attorney *is required* to demonstrate that his questions were asked in good faith, and based on reliable information that can be supported by admissible evidence.

(Emphasis supplied.) *Christenson*, 261 Ga. at 90 (8) (c). We went on in *Christenson* to indicate that the state can make that showing with certified copies of records of those offenses or by producing witnesses to testify concerning the offenses. *Christenson*, 261 Ga. at 91.

Here, notwithstanding our clear and unambiguous holding in *Christenson*, the district attorney did not even attempt to "demonstrate that his questions were asked in good faith, and based on reliable information that [could] be supported by admissible evidence." *Christenson*, 261 Ga. at 90 (8) (c). Instead, he maintained that he was not required to make any sort of showing.

The trial court erred when, in response to Medlock's objection, it did not require the state to "demonstrate that [its] questions were asked in good faith, and based on reliable information that can be supported by admissible evidence." *Christenson*, 261 Ga. at 90 (8) (c).[2] As we did in *Christenson*, we remand this case to the trial court

---

[2] The state's arguments on appeal that the law on this particular issue is unsettled, that our holding in *Christenson* was a change in the law, that there is a difference between character and reputation witnesses, and that *Christenson* is limited to cases in which the state seeks the death penalty are totally without merit. *Christenson* did not work a change in the law but was a restatement of what has been the law in Georgia for quite some time. Accord *Watson v. State*, 137 Ga. App. 530 (8) (224 SE2d 446) (1976), cert. den., *Hudson v. State*,

for a determination of whether the district attorney can support his questions to the defendant's character witnesses as required.

3. Medlock contends the trial court erred in denying his motion in limine to prevent the medical examiner from referring to the victim's death as "homicide." The medical examiner, a pathologist who had performed the autopsy of the victim, gave his opinion that:

> The child died as a result of head trauma. That head trauma was the collection of blood on the surface of the brain, both the subdural and the subarachnoid hemorrage [sic]. The mechanism by which that occurs is very clearly to me one of a shaken infant. The manner of death in a case such as that would be homicide.

A witness generally is not permitted to express his or her opinion regarding an ultimate issue in the case because to do so would invade the fact-finding province of the jury; however, we have allowed an exception to this rule with respect to expert witnesses:

> Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the average layman. [Cits.]

*Smith v. State*, 247 Ga. 612, 619 (277 SE2d 687) (1981).

Prior to stating his opinion, the medical examiner testified at length about the injuries to the victim's head which he had discovered in his examination of the victim's head and skull. He testified that his findings were consistent with injuries found in shaken infants. This testimony is clearly "beyond the ken of the average layman." Here, the expert's conclusion that the infant's death resulting from shaking could only be homicide merely reiterated and underscored his opinion that death in this case resulted from shaking, rather than by accident

---

163 Ga. App. 845 (4) (295 SE2d 123) (1982), cert. den., *Simmons v. State*, 168 Ga. App. 1 (5) (308 SE2d 27) (1983); *Clark v. State*, 186 Ga. App. 106 (6) (366 SE2d 361) (1988), cert. granted and decision affirmed in *State v. Clark*, 258 Ga. 464 (369 SE2d 900) (1988); *Dover v. State*, 192 Ga. App. 429 (7) (385 SE2d 417) (1989); and *Williams v. State*, 201 Ga. App. 384 (411 SE2d 316) (1991). It is also clear, from *Nassar*, supra, *State v. Clark*, supra, as well as the opinions of the Court of Appeals referred to above, that our holding in Div. 8 (c) of *Christenson* is in no way limited to cases in which the death penalty is being sought.

Further, the state's argument that *Christenson* is distinguishable, and that it was not required to provide support for the questions asked of the character witnesses in this case because those questions did not refer to specific felony convictions, "but was merely use of a hypothetical question to determine the parameters of the witnesses' definition of good character," is specious.

or by unintentional causes. We note Medlock did not contend that he *accidentally* shook the baby to death. Rather, his defense was that the baby fell and struck his head on the floor. Under these circumstances, the expert's testimony did not improperly invade the province of the jury. The situation would be different if this expert's testimony had been that death resulted from a blunt force trauma to the head. In that case, his conclusion would have permitted the jury to find the death-causing injury either accidental or intentional, and it would have been impermissible for the expert to state his opinion that homicide was the cause of death. Here, however, the jury could reach no conclusion, based on this expert's testimony, other than that death was homicide, and the expert's testimony did not invade the province of the jury.[3] See also *Maxwell v. State*, 262 Ga. 73, 76-77 (5) (414 SE2d 470) (1992) (neither expert's own investigation nor his expertise as a forensic pathologist led to his conclusion that death was a homicide).

While we find no error regarding the expert's testimony in this case, we note that it would be better practice if experts were instructed not to state a conclusion that death resulted from homicide, a conclusion which may often invade the province of the jury.

4. Medlock contends the trial court erred by denying his motion for mistrial. During the cross-examination of Medlock's wife, the state asked:

Between the time he [Medlock] and Sears and Roebuck were no longer affiliated and the time your child was killed, what did ya'll live on?

Medlock objected to use of the language "the child was killed" and moved for a mistrial. In response, the following transpired:

---

[3] Medlock's account was that the infant placed his feet against Medlock's chest, "kicked off," and fell backwards, landing on his head. The expert testified that his findings might be consistent with the infant having been either rotated rapidly clockwise and counterclockwise, or having been pushed and pulled, and that the rotations would have to have been done forcefully, causing the baby's head to be whiplashed back and forth, and the pushing and pulling would also have to have been done while the infant was forcefully shaken, causing his head to whiplash back and forth. Neither of these situations is consistent with Medlock's defense.

The dissent argues, based on the grandmother's testimony regarding her shaking the infant in her efforts to resuscitate him, that her actions might have resulted in the injuries observed by the expert. However, the expert testified that the injuries he had observed, consistent with shaking, were the cause of death. Medlock does not contend the grandmother killed the baby in her resuscitation efforts. Rather, he contends death resulted accidentally, from the baby's pushing off him and falling to the floor.

Thus, the expert's conclusion that death resulted from homicide, under the facts of this case, merely reiterates his previous testimony that death resulted from shaking, and is not contradicted by Medlock's defense of accident.

THE STATE: Oh, phooey.

THE COURT: I'm going to deny the mistrial.

DEFENSE COUNSEL: Would you admonish the District Attorney not to refer . . .

THE STATE: Your Honor, the testimony is here and the Court's ruled on the motion that there's evidence before this jury that that child was murdered. I can certainly ask that question.

THE COURT: I'm going to allow the question.

THE STATE: Thank you, Your Honor.

DEFENSE COUNSEL: And for the record, we're going to renew our motion, Your Honor.

On appeal Medlock does not raise any error regarding the state's use of the language "the child was killed," but argues the trial court should have granted a mistrial because of the state's reference to the trial court's ruling denying Medlock's motion for a directed verdict. Although Medlock did not ask for a mistrial on this ground, or object to the state's reference to the court's ruling on the motion for directed verdict, we agree that reference was improper. See *Washington v. State*, 80 Ga. App. 415 (56 SE2d 119) (1949). We also note that pursuant to OCGA § 17-8-75,[4] it would have been appropriate for the trial court, even without objection, to take some sort of corrective action. Nevertheless, in light of the circumstances — that the district attorney's comment came in response to a defense objection, and that the district attorney did not refer to a "directed verdict of not guilty" (compare *Washington v. State*, supra)[5] — we find no reversible error.

5. We find no merit to the defendant's remaining enumerations.

*Judgment affirmed in part and remanded in part. All the Justices concur, except Benham and Fletcher, JJ., who dissent.*

FLETCHER, Justice, dissenting.

For the reasons set forth below, I respectfully dissent to Divs. 2, 3, and 4 of the majority's opinion.

1. While I agree with Div. 2 of the majority's opinion that the

---

[4] OCGA § 17-8-75 provides:

Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

[5] In fact, the jury may very well not have understood that the district attorney was referring to the motion for directed verdict, which was made outside the jury's presence but might have believed that the district attorney was referring to the defense motion for mistrial, which had just been overruled within the jury's presence.

trial court erred in overruling Medlock's objections to the state's cross-examination of Medlock's character witnesses, I would reverse the conviction rather than remanding as we did in *Christenson v. State*, 261 Ga. 80, 90 (8) (c) (402 SE2d 41) (1991).

Where the defense calls a witness to testify as to the general character and reputation of the accused, the state is permitted to cross-examine that witness concerning whether he has heard that the accused has been charged with or convicted of specific offenses in order to test the witness' credibility and the parameters of his definition of good character and good reputation. However, the state is not permitted to cross-examine the accused's witness concerning:

> unproved crimes or other acts of violence which are inflammatory, prejudicial, and suggestive of facts not in evidence[.]

*Hudson v. State*, 163 Ga. App. 845, 848 (295 SE2d 123) (1982).

It is this basic rule of evidence which led to the Court of Appeals' decisions that the majority cites in footnote 2 of its decision and to our decisions in *Nassar v. State*, 253 Ga. 35, 36 (315 SE2d 903) (1984); *State v. Clark*, 258 Ga. 464 (369 SE2d 900) (1988), and *Christenson v. State*, 261 Ga., supra. However, in all of those decisions except *Christenson*, the failure of the state to demonstrate that its questions concerning specific offenses "were asked in good faith and based on reliable information that can be supported by admissible evidence[,]" has been held to be reversible error. *State v. Clark*, 258 Ga., supra.

We remanded *Christenson* rather than reversing the conviction because the error did not occur in *Christenson* until after the guilt-innocence phase of the trial and during sentencing phase. Thus, it was not necessary to reverse Christenson's conviction to correct the error that had occurred during the sentencing hearing. If, on remand, the state had not been able to show that it had a good faith basis for each of the specific offenses about which it asked Christenson's character witnesses on cross-examination, we would have been constrained to reverse the sentencing phase of that case. However, on remand of *Christenson*, the state was able to establish that it had had a good faith basis for all of the offenses about which it had inquired and we were able to affirm. *Christenson v. State*, 262 Ga. 638 (423 SE2d 252) (1992).

In the present case, the state has already admitted that it did not have a good faith basis for its question to one of Medlock's character witnesses concerning a prior DUI and, in fact, admitted that Medlock had never been charged with or convicted of a DUI.[6] As a result, the

---

[6] The question concerning the DUI was particularly harmful because the state's case was

effect of the majority's remand of the present case is the formulation of a new rule concerning the proper boundaries of cross-examination of a criminal defendant's character witnesses: the state is no longer required to have a good faith basis for *all* of its questions concerning specific offenses but must only have a good faith basis for its questions concerning some of those offenses.

Finally, as is pointed out by the majority, the district attorney that tried the present case is the district attorney that tried the *Christenson* case. We decided *Christenson*, 261 Ga. 80, on March 15, 1991 and denied the motion for reconsideration in that case on March 27, 1991, nearly one year to the day prior to the trial of the present case. The authority we relied upon in deciding Div. 8 of *Christenson* was *Nassar v. State*, 253 Ga., supra, and *State v. Clark*, 258 Ga., supra. Neither of those cases were death penalty cases and one was decided seven years and the other three years prior to our decision in *Christenson*. There can be no question that the district attorney involved in the present case knew that he was required, upon objection from the accused, to demonstrate a good faith basis for his questions to the accused's character witnesses concerning specific offenses of which the accused had been charged or convicted. This brings to mind the words of Justice Sutherland who, in defining the role of a prosecuting attorney, wrote:

> The [District] Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U. S. 78, 88 (55 SC 629, 79 LE 1314) (1935).

2. In Div. 4, the majority concludes that the following comment by the state, while improper, was not reversible error:

---

largely circumstantial and one of the circumstances that the state relied heavily upon was the fact that appellant had had two drinks of whiskey on the night of the child's death.

the Court's ruled on the motion that there's evidence before this jury that that child was murdered.

I disagree and would hold that such comment was reversible error.
(a) OCGA § 17-8-57 provides that:

[i]t is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below with such directions as the Supreme Court or Court of Appeals may lawfully give.

The rationale for this statute is that such comment from the trial court introduces the trial court's opinion concerning fact questions into the minds of the jurors and thereby invades the province of the jury and colors its deliberations.
Because it is improper for a trial court to:

express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused[,]

OCGA § 17-8-57, it is also improper for the state to argue or comment so as to convey the impression that the trial court believes that there is sufficient evidence to establish the elements of the crime charged or that the accused is guilty. 90 ALR3d 822. Comment of this sort by the state is objectionable for the same reasons that such comment is objectionable when made by the court: it introduces the trial court's opinion concerning fact questions into the minds of the jurors, thereby invading the province of the jury and coloring its deliberations.[7]
(b) OCGA § 17-8-75 provides, in part:

Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, *it is the duty of the court* to interpose and prevent the same.

---

[7] A corollary of this rule is that it is improper for the state to argue or comment concerning the fact that the trial court's refusal to direct a verdict for the accused means that the court believes there to be evidence of the accused's guilt or that the trial court would have directed a verdict of acquittal if there was not sufficient evidence to convict the accused. *Hammond v. State*, 156 Ga. 880 (120 SE 539) (1923); *Washington v. State*, 80 Ga. App. 415 (56 SE2d 119) (1949).

(Emphasis supplied.) In taking no action in response to the state's comment that the trial court had ruled that there was evidence that Medlock's son had been murdered, the court, in effect, approved that comment and admitted that the comment correctly reflected its view of the evidence. In so doing, the trial court exacerbated the problem created by the state's improper comment.

That the state's improper comment came in response to an objection by defense counsel concerning another matter in no way justifies the improper comment. The fact that the state did not use the words "directed verdict," "directed verdict of not guilty," or could have been understood to have been referring to something other than the trial court's ruling on the directed verdict motion does not alleviate the harm caused by the state's improper reference to the trial court's opinion concerning what had been proved by the state's evidence.

3. Finally, in Div. 3 of its opinion, the majority concludes that it was not error for the trial court to permit the forensic pathologist who performed the autopsy on the child to testify that the manner of death in this particular case was homicide. I cannot agree.

(a) When the pathologist testified that the child died as a result of head trauma, described that trauma and testified as to the mechanism by which that trauma occurred, he was employing his medical expertise and was testifying concerning a conclusion that was beyond the ken of the average juror. However, when the pathologist went further and testified that, in a case such as the one he had described, the manner of death was homicide, he invaded the province of the jury by drawing a legal conclusion from the facts in issue, the drawing of which did not require that he utilize any of his medical skill, knowledge, or expertise.

(b) The pathologist's conclusion that the manner of death was homicide was particularly harmful in the present case given the nature of Medlock's defense and other testimony presented in the case by another of the state's expert witnesses and by Medlock's mother.

(1) Medlock's defense was that he had not shaken the child and did not know what had caused the injury that resulted in the child's death. Medlock acknowledged that he had dropped the child earlier in the evening when, as he was holding the child in his arms, the child kicked his legs against Medlock's chest causing Medlock to lose his grip on the child. Medlock also testified that: he had calmed the child down, checked for external injuries, tested the child's responses to assure himself that the child had not been hurt by the fall and was responsive and alert; Medlock then put the child to bed; when Medlock went to bed an hour or two later, he checked on the child, realized the child was having difficulty breathing and summoned his wife and mother.

One of the state's witnesses was the child's regular treating physi-

cian and that physician's testimony indicates that the injury to the child may have occurred when Medlock dropped the child. The regular treating physician testified that when a head is in motion and hits an object like a floor, the brain will swing forward and hit the inside of the skull at the point of impact with the floor and then oscillate within its encasing dura causing the vessels that moor the brain to stretch and tear, resulting in intracranial bleeding.

(2) Medlock's mother testified that, on the night of the child's death, when it was first discovered that the child was having trouble breathing and, in initially trying to get the child to breathe, she shook the child. The state asked whether she had shaken "the baby hard enough to slam its brains backwards and forwards in its head" and she responded that she "shook the baby violently." She also responded affirmatively when the state asked her whether, when she was shaking the baby, its "head [was] flopping back and forth."

The testimony of the forensic pathologist indicates that the injury to the child may have occurred when Medlock's mother attempted to resuscitate the child. The forensic pathologist testified:

> This [the tearing of the blood vessels that run between the dura and arachnoid or between the arachnoid and the brain that the forensic pathologist had observed in the child] is a very typical finding in an infant, not an older child, but an infant who has been shaken. This occurs when the brain begins to move back and forth within the skull. The skull and the brain can really move a little bit apart from each other. The brain sits inside the skull cavity rather loosely. It's not really attached down in many places except right at the bottom. When an infant is shaken, it has something to do with the fact they don't have a whole lot of muscular support in their neck. Their necks aren't as strong as older children and adults. The head begins to move in a whiplash-type motion. The brain and the skull actually begin to move a little bit apart from one another; and as this happens, these very thin, delicate blood vessels get torn and the blood collects.

As unpleasant as it is to contemplate other ways in which the child may have suffered the injuries to his head that the forensic pathologist concluded were the cause of the child's death in this case, there was evidence in this case that those injuries may have occurred when the child fell from Medlock's arms or when Medlock's mother was trying to resuscitate the child. If either were indeed to be the case, there can be no question that the manner of the child's death would not have been homicide. As a result, the forensic pathologist's conclusion was particularly harmful in that he was permitted to ex-

press an opinion concerning the ultimate issue in the case, an opinion which was not the result of any medical knowledge on his part and about which there was conflicting testimony.

The majority agrees that the trial court erred in overruling Medlock's objections to the state's cross-examination of Medlock's character witnesses; agrees that it was improper for the district attorney to refer to the fact that the trial court had ruled that "there's evidence before this jury that that child was murdered"; and states "that it would be better practice if experts were instructed not to state a conclusion that death resulted from homicide, a conclusion which may often invade the province of the jury." Having reached such conclusions, I find it difficult to understand the majority's refusal to reverse this conviction and afford Medlock what he has been denied thus far: a fair trial.

I am authorized to state that Justice Benham joins in this dissent.

DECIDED JUNE 28, 1993.

*William J. Mason*, for appellant.

*Douglas C. Pullen, District Attorney, Murray J. Weed, Assistant District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Peggy R. Katz, Staff Attorney*, for appellee.