S98A0969. ALEXANDER v. THE STATE.
(509 SE2d 56)

SEARS, Justice.

The appellant, Darien Alexander, appeals from his conviction for malice murder stemming from the shooting death of Delma Goddard, as well as from his conviction for falsely reporting a crime.[1] On appeal, Alexander contends, among other things, that the prosecutor explained in his opening statement that the evidence would show that the crime was gang-related, that the evidence did not show such a connection, and that therefore the prosecutor's opening statement regarding the gang-related nature of the crime requires reversal. We agree with Alexander that the prosecutor failed to offer evidence of the gang activity that he detailed in his opening statement, and that Alexander's convictions must therefore be reversed.

The evidence showed that sometime between 6:00 and 7:00 p.m. on May 26, 1996, Alexander, along with Rondrell Durden, Rodriguez Hartry, and several others, went to a "Stop the Violence" rally at Bonner Park in Milledgeville, Georgia, in Alexander's pickup truck. A brown van pulled next to Alexander's truck, and an argument ensued. Two police officers saw the argument and approached. Alex-

---

[1] The crimes occurred on May 26, 1996. Alexander was indicted on May 29, 1996, and was convicted on September 27, 1996. On October 7, 1996, the trial court sentenced Alexander to life in prison for murder and to a concurrent one-year term in prison for falsely reporting a crime. Alexander filed a motion for new trial on November 7, 1996, and an amended motion for new trial on February 3, 1998. The court reporter certified the trial transcript on January 9, 1998, and the trial court denied Alexander's motion for new trial, as amended, on March 6, 1998. Alexander filed his notice of appeal on March 6, and the case was docketed in this Court on March 24, 1998. The case was submitted for decision on briefs on May 18, 1998.

ander and his friends, as well as the occupants of the van, saw the officers and drove off.

About 8:00 p.m. on May 26, Alexander was at the Milledgeville Manor apartments with Raheem Vasser, Rodriguez Hartry, Rondrell Durden, and Danny and David Renfro. Mr. Hartry had a nine millimeter handgun. According to David Renfro, Durden suggested that they take a ride to Fifth Street. David testified that Hartry then said, "they're having a party down there." Danny and David testified that about 8:00 p.m. they all left the Manor apartments in Alexander's pickup truck, and drove to the Renfros' home. Once there, Vasser, who had been riding in the passenger seat and who is the Renfros' brother, asked David Renfro to get his shotgun. David got it and gave it to Vasser. Danny and David Renfro stayed at their house, but the other four left in Alexander's truck, with Alexander driving, Durden in the passenger seat, and Vasser and Hartry in the bed of the truck.

Vasser testified against Alexander, stating that he saw Alexander, Durden, and the Renfros at the Manor, and that they left there to go to his house (also the home of the Renfros) to get a shotgun. Vasser stated that David Renfro got Vasser's shotgun, and that Vasser, Alexander, Durden, and Hartry then drove to Fifth Street, with Alexander driving the truck, Durden riding in the passenger seat, and Vasser and Hartry riding in the bed of the truck. Vasser testified that he had the shotgun, and that Hartry had a nine millimeter handgun. He also stated that they were going to Fifth Street to get some marijuana. According to Vasser, they drove down Fifth Street, a dead-end street, and turned around. He testified that, when they were coming back up Fifth Street, he said that he was "fixing to shoot up in the air"; that he then fired the shotgun twice into the air; and that Hartry fired the pistol two or three times. Vasser testified that he thought that Hartry was holding the gun level when he fired. Vasser testified that he and Hartry were shooting just to try to scare people.

Doris Brown was sitting on her front porch at 157 Fifth Street on the evening of May 26 visiting with several of her family members. One of those visiting was her son-in-law, Delma Goddard. Ms. Brown testified that she saw Alexander's truck drive down the street, and that she thought that someone turned off the truck's lights. She added that when the truck come back up the road, and reached her residence, several shots were fired from the bed of the truck. A bullet hit Delma Goddard in the neck, severing his carotid artery. He later died from the wound. Forensic evidence established that a bullet recovered from Ms. Brown's residence was fired from Hartry's weapon. A relative of Ms. Brown's who was standing beside the porch testified that he saw Hartry aim the weapon at the porch area and fire it, and that he saw the other person in the back of the truck fire a

shotgun into the air.

Almost immediately after the shooting, Alexander encountered a police car, and he and his co-defendants abandoned Alexander's truck and fled on foot. According to David Renfro, shortly after he was dropped off at home, he heard shots and then sirens. David and Danny then saw Hartry, Alexander, and Durden running up their street. David testified that Alexander appeared nervous, and that Hartry asked to use the phone. David added that he heard Hartry say his sister's name and then tell her that if anyone asked where he had been, to tell them that he had been at home all day. David testified that Hartry also called Michelle Mason and asked her to pick them up at the Renfros' home; that a few minutes later Michelle arrived in her car; and that Hartry, Alexander, and Durden then left with Michelle. Alexander subsequently reported to the police that his pickup truck had been stolen.

Alexander and Hartry were tried jointly, and both were found guilty of malice murder. Alexander was also found guilty of falsely reporting a crime.[2]

1. Having reviewed the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Alexander was a party to the crime of murder and was guilty of falsely reporting a crime.[3]

2. Alexander contends that his conviction should be reversed because the prosecutor gave a detailed explanation during his opening statement regarding how he expected the evidence to prove that the shooting was gang-related, but during trial failed to offer evidence to support his assertions.

Before trial, Alexander filed a motion to prohibit the prosecutor from referring to gangs in his opening statement or at trial. The trial court denied the motion based upon the prosecutor's statement that he would introduce evidence that the motive for the crime was gang-related.[4] During the prosecutor's opening statement, and over defense counsel's objection, the trial court permitted the prosecutor to explain that he would show that Alexander, Hartry, Vasser, and Durden were members of the Folks Gang; that they were involved in an argument with some members of the Blood Gang at the "Stop the Violence" rally; that the Blood Gang is known to "hang out" in the Fifth Street area; that, because Alexander and his companions were

---

[2] Before Alexander's and Hartry's trial, Vasser and Durden pled guilty to voluntary manslaughter.

[3] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] The trial court properly denied the motion based upon the prosecutor's representation regarding the relevance of gang activity, and wisely admonished the prosecutor that gang membership "needed to be relevant in some way" and that the prosecutor "needed to be prepared to explain how it's relevant if it comes up [and] why it is admissible."

mad about the earlier argument, they went to Fifth Street and committed the drive-by shooting to terrorize a neighborhood of the Blood Gang.

During the trial of the case, however, despite his detailed recital of what he expected the evidence to show in the way of gang activity, the prosecutor did not attempt to establish the identity of the people with whom Alexander and his friends argued at the "Stop the Violence" rally. Further, although defense counsel asked a state's witness if he knew the identity of the driver of the van at the rally, and although that witness readily identified the driver, the prosecutor did not call that person as a witness at trial in an attempt to establish that he and his friends were members of the Blood Gang. The prosecutor, in fact, made no attempt to establish this fact at trial. Further, despite specifically stating in his opening statement that the evidence would show that Fifth Street was within the territory of the Blood Gang, the prosecutor similarly made no attempt to establish that fact. Finally, despite specifically stating that he would demonstrate that Alexander and his friends were members of the Folks Gang, the prosecutor only established that Vasser was a member of that gang, and made no attempt to show that Alexander or any of his other friends were members of the gang.[5] In addition, the record shows that Vasser was not at the rally at Bonner Park. Based on these circumstances, we conclude that the record demonstrates that the prosecutor failed to offer evidence of the significant connection to gangs that he detailed in his opening statement.

We have held that a prosecutor should confine his opening statement to an outline of what he expects admissible evidence to prove at trial, and that if a prosecutor departs from these guidelines, a conviction will not be reversed if the prosecutor acted in good faith and if the trial court instructs the jury that the prosecutor's opening statement is not evidence and has no probative value.[6] As stated in the ABA Standards For Criminal Justice, "[t]he prosecutor's opening statement should be confined to a brief statement of the issues in the case and to remarks on evidence the prosecutor intends to offer which the prosecutor believes in good faith will be available and

---

[5] At one point, the prosecutor asked a person who witnessed the shooting whether he had ever heard of the Folks Gang. Defense counsel objected, and the prosecutor stated that he wanted to ask the witness about the "hand signs, the territory, and the markings they had." The trial court, carefully monitoring this issue, properly refused to permit the prosecutor to pursue this line of questioning. The court stated that the prosecutor first had to lay a foundation demonstrating that gang activity was relevant to the case by establishing that the incident at the "Stop the Violence" rally was gang related. The prosecutor stated that he would make that showing, but he never did so.

[6] See *Cargill v. State*, 255 Ga. 616, 635-636 (21) (a) (340 SE2d 891) (1986).

admissible."[7] Because it is the prosecutor's duty to abide by this rule, and because, when a prosecutor does not offer evidence during trial to support what he said he would prove in opening statement, the only person in many instances who will know the reason for this failure is the prosecutor, we conclude that it is appropriate to place the burden on the prosecutor to show that the failure to offer this proof was in good faith. This burden is consistent with the burden we place on prosecutors in a similar context. In this regard, we have held that when a prosecutor is cross-examining a defense character witness concerning other criminal charges brought against the defendant, and the defendant objects, "the prosecuting officer is required to demonstrate that the 'questions were asked in good faith, and based on reliable information that can be supported by admissible evidence.' "[8] In the present case, when Alexander made a motion for mistrial based upon the prosecutor's failure to offer the detailed proof of the gang-related nature of the crime that he stated in opening statements he would prove, the prosecutor offered no explanation regarding why he failed to do so. Accordingly, we cannot conclude that the opening statement was made in good faith.

We turn next to an examination of the trial court's curative instructions. The instruction simply consisted of the standard jury charge, given during the trial court's final charge to the jury, that opening statements are not evidence. The instructions did not refer to the prosecutor's statements regarding gangs, and did not instruct the jury not to consider those statements. In *Cargill*,[9] we did not state whether the curative instruction given in that case was merely the general instruction given in the trial court's final charge or whether it was a specific instruction geared toward the prosecutor's statement. We now hold, however, that the type of instruction that is necessary will vary depending upon the prejudicial impact of the prosecutor's statement, with specific instructions being necessary in particularly prejudicial cases, and general instructions sufficing in most cases.[10] Stated somewhat differently, in most cases, we believe that a general charge will make it highly probable that an improper opening statement did not contribute to the verdict and was therefore harmless.[11]

We conclude, however, that in this case the prosecutor's opening statement was prejudicial enough that the trial court's general

---

[7] ABA Standards For Criminal Justice, 3-5.5 (3d ed. 1993).

[8] *Thompson v. State*, 265 Ga. 677, 678-679 (2) (461 SE2d 528) (1995), quoting *Christenson v. State*, 261 Ga. 80, 90-91 (8) (c) (402 SE2d 41) (1991).

[9] 255 Ga. at 635-636.

[10] See generally *United States v. Williams-Davis*, 90 F3d 490, 507 (D.C. Cir.) (1996).

[11] *Johnson v. State*, 238 Ga. 59 (230 SE2d 869) (1976).

charge did not render the opening statement harmless. Illustrating the prejudicial nature of the prosecutor's opening statement is the fact that the trial court found it necessary on several occasions to caution the prosecutor to tie the shooting on Fifth Street to the alleged gang activity, in particular stating at one point that the prosecutor needed to demonstrate that the argument at the "Stop the Violence" rally was gang related. The prosecutor, however, never offered any proof that a dispute between the Blood and Folks Gangs arose at the "Stop the Violence" rally and culminated in the death of Delma Goddard on Fifth Street. Moreover, the improper portion of the prosecutor's opening statement did not concern a minor or collateral aspect of the case, but effectively gave the jury a detailed road map for convicting Alexander. In addition, the State's case against Alexander was built upon the theory that he was a party to the crime, as it is undisputed that he did not fire one of the weapons. Alexander's defense, on the other hand, was built upon the theory that he did not know that Hartry and Vasser would fire the weapons. The prosecutor's detailed statement regarding the motivation for the crime provided a specific reason why Alexander would have known that Hartry and Vasser would fire the weapons. In addition, although the prosecutor did not use the word "gang" in his closing argument, he did reiterate that the shooting resulted from the argument at the "Stop the Violence" rally, thus highlighting the alleged gang connection.

Considering the foregoing factors, we cannot conclude that the trial court's general charge that opening statements are not to be considered evidence made it highly probable that the prosecutor's opening statement did not contribute to the verdict. Accordingly, we must reverse Alexander's conviction.

*Judgment reversed. All the Justices concur, except Hunstein, Carley and Hines, JJ., who dissent to Division 2 and to the judgment.*

CARLEY, Justice, dissenting.

The majority opinion creates a substantial change in Georgia law by holding that the trial court was required to grant a motion for mistrial simply because the prosecutor did not volunteer an explanation for failing to prove a certain portion of his opening statement and because the trial court did not instruct the jury to disregard that particular portion. I submit that the trial court was well within its discretion in denying Alexander's motion for mistrial and the judgment of conviction should be affirmed.

Historically, this Court has not even considered the question of good faith in the prosecutor's opening statement, where the trial court instructs the jury to disregard what the prosecutor says he hopes or expects to prove, but does not prove. *Sterling v. State*, 89 Ga.

807 (1) (15 SE 743) (1892). Eventually, good faith was acknowledged as the general test in passing upon the prosecutor's opening statement. *Daniels v. State*, 58 Ga. App. 599, 605 (3) (199 SE 572) (1938). However, contrary to the assertion of the majority, no Georgia appellate court has ever held that, where the trial court instructs that opening statements are not evidence and have no probative value, "a conviction will not be reversed if the prosecutor acted in good faith. . . ." Instead, this Court and the Court of Appeals have consistently held that, where there is such an instruction, "no error is committed where it does not *appear* that the remarks of the prosecutor were *otherwise* than in good faith." (Emphasis supplied.) *Cargill v. State*, 255 Ga. 616, 636 (21) (a) (340 SE2d 891) (1986). See also *Jordan v. State*, 78 Ga. App. 879, 883 (6) (52 SE2d 505) (1949); *Daniels v. State*, supra at 600 (3). In other words, there must be *some* showing that the prosecutor's remarks were in bad faith. Due to the limited effect of an opening statement, an "accused who asserts it as misconduct must prove more than the mere failure to adduce the testimony described in it, he must also prove bad faith in the introduction of such statement." 23A CJS, Criminal Law, § 1242, p. 131. See also *Walden v. State*, 170 Ga. App. 880, 881 (3) (318 SE2d 676) (1984).

The majority's reliance on *Thompson v. State*, 265 Ga. 677, 678-679 (2) (461 SE2d 528) (1995) is misplaced. The majority opinion itself shows that *Thompson* involves cross-examination at the *evidentiary* stage regarding the *defendant's prior criminal offenses*. In such cases, there is a unique potential for prejudice, and " 'the district attorney *is required* to demonstrate that his questions were asked in good faith, and based on reliable information that can be supported by admissible evidence.' [Cit.]" (Emphasis in original.) *Medlock v. State*, 263 Ga. 246, 247 (2) (430 SE2d 754) (1993). Such language has never been used in the "opening statement" cases. Even if the issue here had arisen during cross-examination regarding prior criminal offenses, this Court would not reverse the judgment but would, at most, remand the case for the trial court to determine whether the prosecutor could make the required showing. *Medlock v. State*, supra at 247-248 (2); *Christenson v. State*, 261 Ga. 80, 91 (8) (c) (402 SE2d 41) (1991). However, because this case does not involve the evidentiary stage, neither reversal nor remand is proper.

Indeed, the reversal of the judgment in this case is especially inappropriate. It appears that nothing in the record indicates that the crimes were not gang-related or that the prosecutor acted in bad faith. To the contrary, the prosecutor attempted to question an eyewitness about the gang of which Alexander was a member, and presented evidence that one participant in the shooting was a gang member and that the murder occurred by means of a drive-by shooting after a confrontation between two groups, which is classic gang

activity. Thus, the gang-related nature of the crime is a reasonable inference from the evidence. *Thomas v. State*, 268 Ga. 135, 137 (4) (485 SE2d 783) (1997); *Freeman v. State*, 130 Ga. App. 718, 720 (1) (204 SE2d 445) (1974). In the absence of a showing of bad faith, the granting of a mistrial is a drastic remedy for a prosecutor's mention, in opening statement, of certain details which are not later proved, but which would constitute merely additional support for a reasonable inference from the admissible evidence.

The Supreme Court of Pennsylvania has held that, "[e]ven if an opening [statement] is somehow improper, relief will be granted only where the unavoidable effect is to so prejudice the finders of fact as to render them incapable of objective judgment. [Cits.]" *Commonwealth v. Brown*, 711 A2d 444, 456 (Pa. 1998). The trial court here avoided any prejudicial effect on the jury in the manner long set forth in Georgia law, by instructing the jury that opening statements are not evidence. This instruction was given both before opening statements and during the final charge. No Georgia case has ever required an instruction to specify which portion of the opening statement the jury should disregard. See *Cargill v. State*, supra at 636 (21) (a); *Sterling v. State*, supra, 807 at (1); *Jordan v. State*, supra at 883 (6); *Daniels v. State*, supra at 600 (3). The majority erroneously declares that this Court did not state what curative instruction was given in *Cargill*. Actually, no curative instruction was given in *Cargill*, but this Court did approve of an instruction "that the remarks of counsel in opening [statement] are of no probative value. . . ." *Cargill v. State*, supra at 636 (21) (a).

The trial court gave substantially the same general instruction which was approved in *Cargill*. It does not appear that the prosecutor's remarks were made in bad faith and, in my opinion, the record reveals that those remarks were made in good faith. Thus, I believe that *Cargill* and other relevant cases, far from supporting the majority's conclusion, demand the affirmance of the trial court's judgment. Under the majority opinion, any failure of the prosecutor to prove any portion of his opening statement will always be reversible error unless he successfully and affirmatively demonstrates his good faith. This is an unwarranted departure from previous Georgia law and, therefore, I respectfully dissent.

I am authorized to state that Justice Hunstein and Justice Hines join in this dissent.

DECIDED DECEMBER 4, 1998 —
RECONSIDERATION DENIED DECEMBER 17, 1998.

*Reginald L. Bellury*, for appellant.
*Fredric D. Bright, District Attorney, Stephen A. Bradley, Assis-*

*tant District Attorney, Thurbert E. Baker, Attorney General, Angelica M. Woo, Assistant Attorney General,* for appellee.