S06A0385. HOLTON v. THE STATE.
(632 SE2d 90)

THOMPSON, Justice.

Defendant Tonie Llera Holton was convicted of malice murder in connection with the death of Debra Moss Holton in 1982.[1] She appeals, asserting, inter alia, that the delay in prosecuting this case for two decades prejudiced her defense and violated her due process rights. Finding no reversible error, we affirm.

The victim married John Holton on February 28, 1978. They separated approximately four years later and were divorced on May 19, 1982. John continued to live in the marital home. The couple's child lived with or visited John in the home on a regular basis. At

---

[1] The murder occurred on September 25, 1982. Defendant was indicted on October 23, 2002, and charged with malice murder and felony murder, predicated on the underlying felony of aggravated assault. (Defendant was also charged with one count of feticide which was nolle prossed prior to trial.) Trial commenced on January 27, 2003. The jury returned its verdict on January 31, finding defendant guilty of malice murder and felony murder. The trial court sentenced defendant to life in prison for malice murder. The felony murder conviction was vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (4) (434 SE2d 479) (1993). Defendant's timely filed motion for a new trial was denied on August 15, 2005, and defendant filed a notice of appeal on September 2, 2005. The case was docketed in this Court on November 1, 2005, and orally argued on February 13, 2006.

about the time of the divorce, John met the defendant. He offered to let defendant stay in his house and he gave her a key. Thereafter, on June 4, 1982, John and defendant were married; they continued to live in John's house.

On the morning of September 25, 1982, the victim went to John's house. (Some of the victim's clothes and personal effects were still there.) She rang the doorbell several times and placed a note on the screen door. Defendant came to the door with a sawed-off shotgun. She fought with the victim in the front yard; then she fatally shot her. An autopsy revealed that the victim was five months pregnant.

Defendant acknowledged that she shot the victim, but claimed the gun discharged accidentally. According to defendant, the victim attacked and scratched her. Then, as they fought, the victim pulled a clump of her hair, causing defendant to fall back through the doorway of the house, discharging the gun.

The State introduced evidence that defendant and the victim had a heated telephone conversation within two days of the shooting. It was also established that the night before the shooting, the victim went to a bar where defendant worked; that when the victim entered the bar, defendant threw a glass ashtray at her and told her to "come get [her] stuff"; and that a bouncer then escorted the victim out of the bar.

John testified that defendant expressed no remorse on the day of the shooting and that several months later she boasted that she "blew the bitch away." John added that defendant dispassionately said she gleaned a leather jacket from the victim's death.

Finally, the State presented the testimony of a firearms expert who tested the shotgun and opined that the trigger pull required six pounds of pressure and that the shotgun would not fire accidentally. It also introduced the testimony of an expert who testified that the shotgun spray pattern indicated that the victim was shot from a distance of 14 feet; and that the pattern was inconsistent with defendant's version of events.

1. The evidence was sufficient to enable any rational trier of fact to find defendant guilty beyond a reasonable doubt of malice murder. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Although defendant was arrested in 1982, the grand jury declined to indict her at that time and the case was closed. Nearly 20 years later, a friend of the victim's family contacted the district attorney's office to inquire about the case. The district attorney's office decided to re-open the investigation and, in late 2002, defendant was indicted.

Defendant claims she was denied her due process rights because the State delayed the prosecution for 20 years. In order to prevail on

this claim, defendant must show (1) that the delay actually prejudiced the defense *and* (2) that the prosecution deliberately delayed the case in order to gain a tactical advantage. *Jackson v. State*, 279 Ga. 449, 450 (2) (614 SE2d 781) (2005); *Wooten v. State*, 262 Ga. 876, 878 (2) (426 SE2d 852) (1993). Defendant has not made either showing. True, several witnesses died in the intervening years[2] and some pieces of evidence were missing.[3] But this hindered the prosecution as much as defendant; it is the type of prejudice inherent in any extended delay. See *Jackson v. State*, supra; *Roebuck v. State*, 277 Ga. 200, 205 (586 SE2d 651) (2003). And even if defendant could show actual prejudice as a result of the delay, it cannot be said that the delay was the product of deliberate action by the State.

Defendant invites this Court to hold that she need not show that the State acted deliberately to delay the case. In this regard, defendant asserts that she should be able to meet her burden by simply showing that the State acted with reckless disregard of the prejudicial impact upon her. See *Jackson*, supra at 450, n. 2. If defendant had demonstrated actual prejudice as a result of the delay, we might be inclined to consider defendant's invitation. However, inasmuch as defendant failed to make such a showing, we see no reason to plumb this issue at this time. Id.

3. The trial court did not err in permitting an officer to testify that defendant "had a few small scratches, very minor, around her face" and that they were not "something that would be gained in a scuffle." "[T]he opinion given by the [officer] was a conclusion or opinion based upon her personal observation of a physical fact and not [an expert] opinion. Description of one's physical observations and opinions logically flowing therefrom have long been admissible in this state." *Robinson v. State*, 168 Ga. App. 569, 571 (2) (309 SE2d 845) (1983). See also *Munsford v. State*, 235 Ga. 38, 42 (218 SE2d 792) (1975); *Mobley v. State*, 212 Ga. App. 293, 296 (2) (441 SE2d 780) (1994).

4. Defendant's brother, Mark Llera, was in the house when the shooting took place. Because he was deceased at the time of trial, the State sought permission to introduce a statement made by Llera under the necessity exception to the hearsay rule. The statement was made to defendant's husband, John, approximately one month after the shooting. John, who prompted the conversation, testified as follows:

---

[2] These included defendant's brother, a lead detective, and an EMT who arrived at the scene.

[3] The shotgun and wadding had been lost. However, it had been tested shortly after the shooting and the firearm expert who conducted the tests testified.

It didn't make sense to me that a guy [Llera] being a medic in the army, why he would let [the victim] bleed out when he could stop that. So my question to him was, how did this come about; how did it happen that she lay there and bled out with you in the house. And he said, well [defendant] slammed the door and said, "leave the bitch lay."

The trial court admitted Llera's statement over defendant's objection that the evidence was hearsay.

Under OCGA § 24-3-1 (b), hearsay evidence is admissible in "specified cases from necessity." To be admissible under this hearsay exception, our courts require that the declarant be dead or unavailable to testify and that there be particular guarantees of trustworthiness. In addition, the statement must be relevant to a material fact and more probative of that fact than other evidence that may be procured and offered. *Holmes v. State*, 271 Ga. 138, 139 (516 SE2d 61) (1999). Whether a statement was accompanied with particular guarantees of trustworthiness is a matter which lies in the discretion of the trial court. *Myers v. State*, 275 Ga. 709, 712 (572 SE2d 606) (2002). "The test is whether 'the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility.'" *Chapel v. State*, 270 Ga. 151, 155 (510 SE2d 802) (1998).

Defendant asserts the trial court abused its discretion in admitting Llera's statement because it was not shown to be trustworthy. We are compelled to agree. The trial court opined that Llera's statement was admissible because Llera and John were in-laws, they were speaking in a "non-confrontational situation," and defendant was living in John's house. However, the mere fact that Llera and John were in-laws does not point to the reliability of Llera's statement. See *Myers v. State*, supra at 713 (existence of familial relationship alone does not establish trustworthiness). Likewise, the fact that defendant was living under John's roof and Llera and John's discussion was non-confrontational provides little, if any, guidance. More telling are the facts that John only knew Llera for a few months when Llera made the statement to him; that there was no evidence that Llera confided in John, or turned to him for help with his personal problems; and that John himself said he only trusted Llera "with some reservations." Compare *Ward v. State*, 271 Ga. 648, 650 (520 SE2d 205) (1999) (witness and declarant were "good friends" for many years and had a "trusting," confidential relationship). And, perhaps most importantly, is the fact that Llera had given John "conflicting"

versions of what transpired.[4] Compare *Azizi v. State*, 270 Ga. 709, 712 (512 SE2d 622) (1999) (consistent statements made to sisters were reliable) with *Mallory v. State*, 261 Ga. 625, 628 (409 SE2d 839) (1991) (inconsistent statements to son and friend were unreliable). Thus, considering the totality of the circumstances, as we are bound to do, *Fetty v. State*, 268 Ga. 365, 367 (4) (489 SE2d 813) (1997), it is not Llera's reliability, but his unreliability which comes to the fore.

However, it is highly probable that any error in admitting Llera's statement did not contribute to the judgment of conviction.[5] The statement was introduced to show defendant's state of mind at the time of the shooting and demonstrated that defendant bore ill will toward the victim. This was established by other evidence that the victim was having trouble getting her belongings back from defendant and that defendant threatened her, saying she could shoot her and get away with it; that defendant threw an ashtray at the victim the night before the shooting; that on the day of the shooting, defendant expressed no remorse, was very calm, and even "jovial"; and that defendant later boasted that she "blew the bitch away."

5. Defendant asserts the trial court erred in denying defendant's motion for new trial because the prosecution failed to prove assertions it made in its opening statement. More specifically, defendant contends the prosecution did not back up its claims that defendant was motivated by jealousy and that evidence had been tampered with. This contention is without merit.

The prosecution presented evidence which would have led the jury to believe that defendant, her husband and the victim were involved in a love triangle and that the screen door of the house had been removed after the shooting. Although the prosecution's opening statement may have painted with a broad brush, it was not misleading.

> In *Alexander v. State*, 270 Ga. 346 (2) (509 SE2d 56) (1998), we held that opening statements by the State should be confined to an outline of what the State expects admissible evidence will prove at trial, and that even if the opening statement departs from [that outline], a conviction will not be reversed if the State acted in good faith and if the trial court instructed the jury that the State's opening statement is not evidence and has no probative value. We need not

---

[4] For example, Llera told John initially that he was asleep when the incident took place. It was Llera's conflicting accounts which prompted John to question Llera further.

[5] Because Llera's statement to John is not testimonial in nature, it does not implicate the confrontation clause of the federal and state constitution; accordingly, we use the "highly probable" harmless error approach. *Gay v. State*, 279 Ga. 180 (2) (611 SE2d 31) (2005).

consider the good faith of the prosecutor in this case, or the effect of the trial court's instruction that opening statements are not evidence, because the prosecution's opening statement was not subject to the argument raised on appeal. Our review of the transcript reveals that the prosecution presented evidence intended to establish every one of the matters which [defendant] enumerates as improper. Thus, the present case is unlike *Alexander,* where the prosecution's opening statement described in detail alleged connections between the crime and gang activities, but there was no attempt to prove the gang-related assertions. By contrast, the prosecuting attorney in the present case set forth in the opening statement what the State intended to prove, and then adduced evidence aimed at proving the specifics of the opening statement's outline. No error appears in regard to the prosecution's opening statement.

*Bellamy v. State,* 272 Ga. 157, 160 (527 SE2d 867) (2000). *Judgment affirmed. All the Justices concur.*

DECIDED JUNE 26, 2006 —
RECONSIDERATION DENIED JULY 27, 2006.

*Perry & Walters, George P. Donaldson III, Misty G. Haskins*, for appellant.
*Kenneth B. Hodges III, District Attorney, Gregory W. Edwards, Assistant District Attorney, Thurbert E. Baker, Attorney General, Edwina M. Watkins, Assistant Attorney General*, for appellee.